Plesko, Plaintiff and Respondent, v. City of Milwaukee, Defendant: Allied Investment Company, Defendant and Appellant.

*February 4—March 5, 1963.*

211

212

For the appellant there were briefs and oral argument by *Michael J. Dunn* of Milwaukee.

For the respondent there was a brief by *Donald R. Hunter* and *Kersten & McKinnon,* attorneys, and *Donald R. Hunter, Arlo McKinnon,* and *Michael O. Donnelly* of counsel, all of Milwaukee, and oral argument by *Mr. Hunter* and *Mr. Arlo McKinnon.*

CURRIE, J.  The issues on this appeal are:

(1) If there is liability to plaintiff, is such liability solely that of the city?

(2) Did the trial court err in permitting Allied's former employee, Ewald Menke, to be examined by plaintiff as an adverse witness?

(3) Is there sufficient evidence in the record to sustain the jury's answers to the questions with respect to Allied's negligence?

(4) Did the trial court err in permitting plaintiff's expert medical witness, Dr. Montgomery, to testify with respect to the history of subjective complaints given him by plaintiff?

(5) May the plaintiff, by reason of her acceptance of the option to take judgment for $5,500, raise on this appeal the issue that the trial court abused its discretion in reducing the damages found by the jury?

(6) Did the trial court abuse its discretion in determining that $5,500 was a reasonable sum to award plaintiff for her injuries?

### Liability of Allied.

Plaintiff's cause of action against both Allied and the city is grounded on nuisance. Allied contends that when a tree which has been growing between the sidewalk and the curb in a city falls and injures someone, the sole liability, if any, is upon the city. This identical contention was advanced by Allied in its former appeal from the order overruling its demurrer to this cause of action and was decided adversely to Allied. *Plesko v. Allied Investment Co.* (1961), 12 Wis. (2d) 168, 107 N. W. (2d) 201. The determination made of this issue on the prior appeal constitutes the "law of the case" and precludes Allied from again raising it. *Langer v. Stegerwald Lumber Co.* (1952), 262 Wis. 383, 385, 55 N. W. (2d) 389.

### Examination of Menke as an Adverse Witness.

Plaintiff called Ewald Menke, the janitor at Allied's apartment building from 1946 to 1951, as an adverse witness. Counsel for Allied objected on the ground that Menke had left Allied's employ about five years prior to trial.

This objection was overruled. The controlling statute is sec. 325.14 (1), Stats., which provides in part as follows:

"Any party or any person for whose immediate benefit any civil action or proceeding is prosecuted or defended, or his or its assignor, officer, agent, or employee, *or the person who was such officer, agent, or employee at the time of the occurrence of the facts made the subject of the examination,* may be examined upon the trial as if under cross-examination, at the instance of any adverse party." (Italics supplied.)

Since Menke was Allied's employee at the time of the occurrence of the facts with respect to which he was questioned by plaintiff's counsel, namely, whether Allied knew of the tree's condition during Menke's term of employment, the statute authorized Menke's being called and examined as an adverse witness. Allied's contention that this was error is without merit.

### Sufficiency of Evidence on Negligence Issue.

Although plaintiff's cause of action is grounded upon nuisance, the liability of Allied is dependent upon whether its negligence caused plaintiff's injuries. Nuisance may be based on either intentional or negligent conduct unless defendant is engaged in an ultrahazardous activity (which is not involved in this case). *Walley v. Patake* (1956), 271 Wis. 530, 541, 74 N. W. (2d) 130, and *Schiro v. Oriental Realty Co.* (1956), 272 Wis. 537, 546, 76 N. W. (2d) 355. Since plaintiff has raised no claim here of intentional conduct on Allied's part, it follows that its liability, if any, must be grounded upon principles of negligence.

The tree which fell was an elm between fifty and eighty years old. Its trunk had a diameter of two feet, eight inches. After the tree fell, the remaining stump was about six and a half feet high on the side nearest the sidewalk and

about three feet high on the side nearest the curb. This stump, because of interior decay, was a hollow shell with about three inches of bark and sapwood forming its outer circumference. There is ample evidence to sustain the jury's finding that the tree was in a dangerous condition at the time of the accident.

The next question is whether the evidence sustains the jury's findings that Allied was chargeable with knowledge of the dangerous condition of the tree for a length of time sufficient to have enabled it to remove the tree prior to the accident. Allied had owned the abutting property on the east side of North Cass street for about thirty-one years prior to the accident. Located on this property was an apartment building having 33 apartments. Allied's janitors mowed the grass between the sidewalk and the curb and were familiar with the tree.

Menke, who was one of these janitors, testified that he had observed a large hole on the side of the tree nearest the sidewalk. This hole extended upward about two and a half feet from the base of the tree, where it was about a foot wide, and narrowed near the top. Sawdust-like material came out of this hole from time to time, and in November, 1948, city firemen extinguished a fire in this hole. On the day after the fire, Menke called the tree's condition to the attention of Wechsler, president of Allied, who made frequent visits to the premises, but Wechsler did not want to discuss the matter. The city forestry department later painted the hole with an asphalt preparation. Decayed material from the interior of the tree continued to come out of this hole and accumulated at times in such quantities that it had to be swept off the sidewalk.

George Schmidt, who was the janitor in charge of the premises commencing in 1951, talked on occasion with Wechsler about the bad condition of the tree. Barbara Schmidt, his wife, testified to having overheard a con-

versation between her husband and Wechsler about three months before the accident at which time Wechsler expressed the fear that the tree would fall on the apartment building and damage it.

The district superintendent in the city forester's office examined the stump after the accident. He testified that it was badly butt-rotted and had been in a rotted and decayed condition for many years.

The foregoing testimony amply supports the jury's findings with respect to Allied's negligence.

Allied also contends that the strong wind, and not its negligence, was the cause of the tree's falling. This argument is apparently premised on the assumption that the wind was an intervening force which superseded Allied's negligence as a legal cause of the accident. Within an hour of the accident, the wind averaged 35 to 37 miles an hour with gusts reaching 46 to 52 miles per hour. United States weather bureau records showed that in the past, winds in the area had reached velocities of 80 to 90 miles per hour. Therefore the velocity of the wind on the night of the accident was not an intervening force which Allied could not reasonably have anticipated. This situation is similar to the one in which a person sets a fire on his own premises and later a strong wind blows sparks onto the property of another which cause damage to it. Where the velocity of the wind is not unprecedented and is reasonably to be expected in the ordinary course of events, it does not in itself relieve the party setting the fire from negligence. *Riley v. Standard Oil Co. of Indiana* (1934), 214 Wis. 15, 23, 252 N. W. 183. See also *Foellmi v. Smith* (1961), 15 Wis. (2d) 274, 279, 112 N. W. (2d) 712, for the principle that where two concurring causes produce an injury and one such cause begins with a person's negligent act, the actor is not necessarily relieved of liability merely because the other cause is beyond his control.

Allied further contends that the jury's finding that defendant city was not chargeable with knowledge of the dangerous condition of the tree prior to the accident is contrary to the evidence. Nevertheless, Allied did not appeal from the separate judgment which dismissed plaintiff's complaint against the city. Therefore, Allied is now precluded on this appeal from questioning such jury finding which had the effect of a finding that the city was not negligent.

### Permitting Dr. Montgomery to Testify to History of Plaintiff's Subjective Complaints.

Within thirty days following the accident plaintiff consulted an attorney and gave the notice to the city required by sec. 81.15, Stats. Thereafter she received a whiplash injury in a rear-end automobile collision on June 24, 1957. The next day after this latter accident she first consulted Dr. Robert Montgomery. She claimed she had made the appointment before the accident of the day before because her leg was bothering her. Nevertheless, Dr. Montgomery testified that most of the initial consultation was concerned with plaintiff's whiplash injury.

Plaintiff's history of subjective symptoms related to the doctor on that occasion were read into the record over objection. With regard to her leg, she complained of pain when walking and during weather changes, discoloration, and tenderness. Dr. Montgomery found this tenderness centered at the point where the leg-lifting muscle attached. X rays taken at various times up to date of trial revealed no evidence of damage. On July 9, 1957, Dr. Montgomery noted that plaintiff reported "no appreciable change in the irregular pain and tenderness . . . of the left leg." He saw her again on July 30, 1957, November 11, 1957, and February 27, 1958.

On May 29, 1958, plaintiff still complained of pain in her left leg during cold, damp weather and upon rising in the morning. Dr. Montgomery could find no objective symptoms: Leg movement was normal, measurements of both legs were within permissible variances, and no redness or local heat was evident. Plaintiff again consulted Dr. Montgomery on August 28, 1958, with no report of improvement. Then on October 23, 1961, the day before the instant trial began, plaintiff again consulted Dr. Montgomery— evidently at the urging of her counsel. The trial court over objection admitted her statements of subjective symptoms on that date.

The court felt that such symptoms were admissible under the authority of *Thompson v. Nee* (1961), 12 Wis. (2d) 326, 107 N. W. (2d) 150, though it expressed some doubt as to its ruling. With the exception of subjective symptoms related by plaintiff to Dr. Montgomery on the day before trial and testified to by him, we hold that the trial court's rulings, which permitted Dr. Montgomery to testify concerning the subjective symptoms related by plaintiff, were proper because of plaintiff's testimony that she consulted Dr. Montgomery for treatment. The fact that plaintiff related these subjective symptoms to the doctor after she retained an attorney is not controlling. *Thompson v. Nee, supra,* at page 330.

Dr. Montgomery's testimony concerning plaintiff's report of subjective symptoms on the day before trial was inadmissible because of the report's proximity to trial. Cf. *Schields v. Fredrick* (1939), 232 Wis. 595, 598, 288 N. W. 241. Nevertheless, even if Dr. Montgomery's opinion with regard to permanency of muscle damage were to be held prejudicial, because based entirely upon subjective symptoms related by plaintiff on the day before trial, Allied cannot now predicate reversible error thereon because it

failed to renew its objection on motions after verdict by merely alleging that there were "errors in the trial" instead of apprising the trial court of the particular error relied upon. *Michalski v. Wagner* (1960), 9 Wis. (2d) 22, 29, 100 N. W. (2d) 354, invoking the rule of *Wells v. Dairyland Mut. Ins. Co.* (1957), 274 Wis. 505, 518, 80 N. W. (2d) 380.

### Right of Plaintiff to Raise Issue of Damages.

Plaintiff has moved for review of the trial court's rulings that the jury's award of $9,950 damages was excessive and that $5,500 was a reasonable amount upon which to give plaintiff an option to accept judgment for that amount or have a new trial limited to damages. Allied urges that plaintiff is precluded from now raising this issue because of her acceptance of judgment in the amount of $5,500 and costs. In *Burmek v. Miller Brewing Co.* (1961), 12 Wis. (2d) 405, 417, 107 N. W. (2d) 583, we held that where a plaintiff is given an option to accept a reduced amount of damages or a new trial limited to damages, his acceptance of the reduced damages precludes his seeking a review of the trial court's determination of the damage issue.

Upon further consideration of the matter a majority of this court conclude that this rule announced in the *Burmek Case* should be limited to the situation where the party awarded damages appeals. The majority further hold that when an opposing party appeals, the party who has accepted the option to take judgment for such a reduced amount of damages may nevertheless have a review on appeal of the trial court's determination of the damage issue. If it is determined on such review, however, that no error was committed by the trial court's disposition of the damage issue, such party's prior acceptance of judgment for the

reduced amount will be affirmed unless the result of the principal appeal requires otherwise.

The reasons motivating the majority to adopt the fore-going rule are these: The objective underlying the recom-mended procedure for granting an option to accept judgment for a reduced amount of damages in lieu of having a new trial, where the damages awarded by the jury are determined by the trial court to be excessive, is to avoid the delay and expense of an appeal or a new trial. In most situations, it is likely that the party will accept judgment for such reduced damages rather than undergo the expense, delay, and uncertainty of result of an appeal or new trial. Never-theless, if a party found liable to pay damages appeals the judgment resulting from the other party's accepting such reduced damages, this objective has been negatived. When plaintiff is forced to undergo an appeal by the action of an opposing party, after plaintiff has accepted judgment for such reduced damages, it seems unfair to prevent his having a review of the trial court's determination leading to the reduction in damages, especially if plaintiff has accepted same only to avoid the delay and expense attending an appeal. Furthermore, the new rule herein announced may to some extent discourage appeals by the party held liable because of the possibility that the party who has accepted judgment for the reduced damages may prevail on his motion for review and have the jury's verdict reinstated.

### The Trial Court's Determination of Damage Issue.

Allied and plaintiff both attack the trial court's determina-tion of damages. Although plaintiff contends that the trial court erred in holding the jury's award of damages ex-cessive, Allied further argues that the sum of $5,500, determined by the trial court to be a reasonable amount, is excessive. Under both contentions this court will not disturb

the trial court's determination unless we find an abuse of discretion. *Lucas v. State Farm Mut. Automobile Ins. Co.* (1962), 17 Wis. (2d) 568, 571, 117 N. W. (2d) 660, and cases cited therein. A review of the evidence concerning damages is necessary in order to determine whether or not the trial court abused its discretion. A portion has already been set forth in discussing Dr. Montgomery's testimony concerning plaintiff's history of subjective symptoms and complaints as related by her.

Plaintiff's injuries from the accident consisted of the following: Cuts on her head, face, arms, legs, and toes resulting from the shattering of the glass in the windshield; cuts in her mouth and ears from glass particles; bruises to both legs; a strained shoulder; and a two-inch-long dent (not a cut) in the fatty tissue of her left leg about six inches below the knee. Plaintiff testified that the blow from the crumpling car top rendered her momentarily unconscious. She seemed to have been conscious of bystanders at the scene of the accident. Plaintiff was immediately taken to a hospital where her cuts were cleansed and band-aids applied. None of the cuts required stitches. She was released from the hospital after two hours but went sleepless most of the night and was absent for three days from her teaching duties.

The next day plaintiff consulted Dr. Northey, her personal physician. He testified that she was in a state of emotional shock and complained of severe headaches. He concluded that she had sustained a concussion. The dent in the left leg appeared to be the most-serious injury because her cuts were superficial. Dr. Northey saw the plaintiff for treatment on two other occasions, June 5 and August 8, 1956. All the cuts had healed by the latter date, but she was still in a nervous condition and her leg bothered her.

As mentioned above, plaintiff consulted Dr. Montgomery, an orthopedist, on four occasions in 1957, the first of these being the day after she sustained a whiplash injury on June 24, 1957. She also saw Dr. Montgomery on February 27 and May 29, 1958. The last time she saw Dr. Montgomery for treatment was on August 28, 1958, more than three years prior to trial. There is no history of her receiving other medical treatment during this period. In preparation for trial she again saw Dr. Montgomery and Dr. Schaeffer, a neurologist and psychiatrist.

From time to time she has had headaches and pain in her left leg.. Nevertheless, the headaches have become less frequent and at time of trial on October 24, 1961, plaintiff testified that they occurred about once every three or four months and that the last one occurred about June 20, 1961. The pain in the left leg generally occurs in damp weather and when she rises in the morning, but there is no loss of motion or any change in the contour or appearance of the leg. The dent in her leg is no longer visible, but the skin at that point is slightly hard to the touch because of some underlying scar tissue. In addition she has an anxiety complex about driving, or riding in, automobiles, but this has not been severe enough to prevent her engaging in frequent automobile trips for vacation and recreational purposes. Furthermore, part of this complex was caused by the two subsequent whiplash injuries sustained in rear-end automobile collisions. As previously mentioned, the first of these occurred on June 24, 1957. The other occurred during a vacation trip in California in December, 1959. We attach no great significance to her decision three years after the accident to temporarily discontinue full-time teaching and become a substitute teacher. Her efficiency as a teacher had not been seriously affected by the accident because she received several merit raises in salary after the accident. She married shortly after the accident and may well have decided,

after continuing to teach for three years, that it was no longer necessary that both she and her husband work. She mentioned, however, that she intended to resume full-time teaching after the trial.

Although there was medical testimony that the headaches, occasional pain in the left leg, and anxiety complex are permanent, we deem significant the fact that for more than three years prior to trial plaintiff sought no medical treatment to alleviate them.

The trial court in its memorandum opinion carefully analyzed the significant portions of the evidence bearing on damages and concluded the award of $9,950 was excessive. We find no abuse of discretion in this conclusion nor in its fixing $5,500 as a reasonable award for plaintiff's injuries in granting her the option to accept this amount in lieu of a new trial limited to damages.

*By the Court.*—Judgment affirmed.