DALTON, Respondent, v. MEISTER, Appellant.*

*No. 9. Argued June 1, 1971.—Decided June 29, 1971.*
(Also reported in 188 N. W. 2d 494.)

* Motion for rehearing denied, with costs, on September 8, 1971.

For the appellant there were briefs and oral argument by *Norman C. Skogstad* and *Gerald P. Boyle,* both of Milwaukee.

For the respondent there was a brief by *Aberg, Bell, Blake & Metzner* of Madison, and oral argument by *Carroll E. Metzner.*

HALLOWS, C. J. Meister raises two issues on this appeal: (1) That he was prejudiced by the rulings of the trial court which excluded evidence of the details of a John Doe and a grand jury proceedings; and (2) that the damages awarded by the jury and approved by the trial court are excessive. We think there is no merit in either contention.

Dalton at the time of trial was forty-five years of age, had been an attorney since 1953, and was an assistant attorney general. In 1963 he became the head of the newly created criminal-investigation division of the attorney general's office. He has had experience in John Doe investigations, investigations involving election-law violations, and grand juries in various counties.

At the time of trial Meister was a banker with other interests including real estate, insurance, and various businesses. Testimony at the trial showed his wealth by his own admission was between two and two and one-half million dollars. Meister was charged with criminal bribery and also unlawful lobbying. On May 5, 1967, in La Crosse the criminal charges of bribery were dismissed on the ground the state witness, a Miss Dorothy Effinger, was too sick to testify. These charges were a result of a grand-jury investigation conducted in Dane county in which Dalton was involved as assistant attor-

ney general. Meister was later tried in Madison on charges of unlawful lobbying which resulted from a secret John Doe proceeding and was acquitted.

Immediately following the dismissal of the criminal charges of bribery in La Crosse, Meister held a meeting in the courtroom with the members of the news media at which he distributed typewritten copies of a typewritten statement which is the basis of the libel in this case.[2] Meister testified the statement was prepared by

[2] "NEWS RELEASE—FOR IMMEDIATE RELEASE—BY HOWARD J. MEISTER

"Eleven months ago, I was indicted by a Grand Jury, illegally constituted, and immoral in every sense of modern day terminology conceived by gestapo leader, LeRoy Dalton, who is now slithering under his rock.

"Today, everyone knows that any and all charges made against me were groundless and conceived in the evil minds of those who thought that through illegal means they could successfully smear me.

"It is now my duty to inform the public that the gestapo, the cancer in the Attorney General's office must be cut out. I for one shall lead that fight, and good men shall join me.

"I must further state that Miss Dorothy Effinger, a known extortionist, is no sicker today than she was seven days ago when she whistled and danced in the halls of the Dane County District Attorney's office. Less than twenty-four hours before the start of this trial, she went over the facts of her extortion attempts of me with the District Attorney, with no claim of illness.

"Her perjury before the Grand Jury under the ringmaster Dalton has agonized my mother, my lovely wife and my four children to a point I cannot comment on.

"Miss Effinger is a liar, an extortionist and is no more ill than she was eleven months ago when her perjured testimony was purchased for immunity for her various crimes. I challenge this female, Dalton and District Attorney Boll to deny the truth of my statement.

"I state, as God is my witness, I am guilty of being a good citizen, fighting for my rights. District Attorney Boll, violating his oath of office, legal ethics and common decency, joined hands with Dalton and Effinger in furtherance of this campaign to smear me. I now state that any reports of threatening phone

him personally the evening before trial in anticipation the bribery charges against him would be dismissed. The statement was widely published by the news media. The evidence also showed Meister attempted through influence and political pressure and the spending of large sums of money to have Dalton removed from his job. Meister had meetings with the news media and complained of Dalton. There is a dispute in the testimony concerning the political pressure Meister exerted on the then attorney general Bronson La Follette to remove Dalton from office. La Follette finally removed Dalton but testified that the removal was not the result of the political influence of Meister,—a statement the jury apparently did not believe. The evidence plainly shows a persistent course of conduct on the part of Meister in his retaliation to "get Dalton."

The contention the trial court erred in excluding evidence of the John Doe and the grand jury proceedings has no basis in fact. Meister argues he had a right, in order to prove Dalton used "Gestapo tactics," to present the question and answer testimony of various witnesses in John Doe and grand jury proceedings. The restric-

---

calls are false and were born of desperation in a last minute effort to prevent the truth from coming out. The only phone call the District Attorney Boll received was from 'anonymous' Dalton.

"Mr. Boll is a sham and a fraud and should be removed from office. He has violated his oath to protect the innocent and has shocked my conscience by openly and publicly admitting that the facts of her crime of extortion in this case were known by District Attorney Boll. He attempted to take a case to court in which he states he had only one witness and I state that that witness should be jailed by Mr. Boll.

"I state that Miss Effinger tried to extort substantial money from me. The temptation to be relieved of these pressures through extortion was so loathsome that I am stunned that District Attorney Boll can even talk to the press without first answering the simple question 'Why don't you prosecute Dorothy Effinger?'

"I now invite gestapo leader Dalton and S. S. Corporal Boll to investigate me, as I know they will, to continue their unorthodox crucificion of Howard J. Meister."

tions upon the admissibility of evidence occurred in the cross-examination of Dalton's witnesses who had been involved in the various John Doe and grand jury proceedings and who had given their opinion on direct examination concerning the manner in which Dalton had conducted himself generally and had treated the witnesses in particular during the secret proceedings. The ruling of the trial court was to the effect that neither the details nor the merits of the proceedings could be inquired into on cross-examination but the conduct of Dalton about which the witnesses had offered their opinions could be.

We think the trial court was right in so limiting the cross-examination. The proceedings were secret and the exact questions and answers were immaterial on the issue of the manner in which Dalton was conducting the proceedings. A witness knows when he is "browbeaten" by an interrogator. A judge who presides over grand jury hearings knows when an attorney uses Gestapo tactics. In refusing the so-called offer of proof by Meister's counsel, the court stated, "the court at no stage of the proceeding refused or intimated that it would refuse the reception of evidence pertaining to the quality or manner of handling witnesses by Mr. Dalton in any proceeding." The offer of proof did not meet this standard.

Meister now asserts the trial court should have reviewed the records of the secret proceedings *in camera* to determine whether in fact they had any bearing on the issues, but no such request was made to the trial court. The record does disclose that prior to trial Meister attempted to gain access to the files of the attorney general which request was denied by Circuit Judge M. EUGENE BAKER of the First Judicial Circuit after an *in camera* review. Judge BAKER ordered the secrecy of the proceedings be maintained and Judge PARNELL'S rulings at trial were consistent.

Meister contends the award of $75,000 in compensatory damages is so excessive and unsupported in the record as to be the result of passion and prejudice. We think not.

In libel actions a successful plaintiff may receive several kinds of damages. Proof of damage in libel as distinguished from some types of slander is not essential to the cause of action. *Martin v. Outboard Marine Corp.* (1962), 15 Wis. 2d 452, 461, 113 N. W. 2d 135. In *Martin*, after discussing the history of defamation, we adopted the common-law rule of libel as stated in Restatement, 3 *Torts,* Defamation, p. 165, sec. 569. In libel and slander per se the law presumes harm which normally results from the defamation. In many cases the harm wrought by defamation is so subtle and indirect it is difficult of monetary proof. Restatement, 3 *Torts,* Measure of Damages in Actions for Defamation, p. 314, sec. 621. *See Williams v. Hicks Printing Co.* (1914), 159 Wis. 90, 100, 150 N. W. 183. But in this case Dalton has proved actual and specific damages resulting from the libel and he is entitled to recover for them. Restatement, 3 *Torts,* p. 316, sec. 622, *also* p. 185, sec. 575, and pp. 318, 319, sec. 623. Since the libel by Meister was found by the jury to be activated by express malice, Dalton is also entitled to recover punitive damages. *See Malco v. Midwest Aluminum Sales* (1961), 14 Wis. 2d 57, 63, 109 N. W. 2d 516.

While Meister claims Dalton suffered no damages to his reputation or in any other way, this argument finds little support in the law or in the record of this case. We think the evidence of specific and special harms sustains the verdict for $75,000 compensatory damages and agree with the trial court when it stated, "The jury was fully justified in drawing the reasonable inferences that defendant's persuasive and pervasive course of conduct in maliciously issuing false, defamatory and nonprivileged libelous and slanderous statements concerning the

plaintiff caused his transfer from high position, the disfavor of the attorney general, the loss of his reputation as a criminal investigator, the abuse of his character as a lawyer, public contempt, ridicule, disgrace and humiliation as a prominent citizen and as a qualified and accepted lawyer and his consequential and continuing mental suffering and anxiety." It is true some of these elements may also be considered in assessing general compensatory damages, others constitute only specific harm. 50 Am. Jur. 2d, *Libel and Slander*, p. 878, sec. 356, *et seq.*

Meister also challenges the amount of punitive damages awarded Dalton was the result of prejudice and passion. The trial court, however, found no prejudice or passion and pursuant to the *Powers* rule, first applied to punitive damages in *Malco v. Midwest Aluminum Sales, supra,* reduced the award of punitive damages as being excessive from $200,000 to $75,000. Dalton exercised the option to accept the reduced award, remitting the excess, and avoided a new trial. He now seeks under sec. 274.12, Stats., a review of the reduction, which he can do under *Plesko v. Milwaukee* (1963), 19 Wis. 2d 210, 220, 120 N. W. 2d 130, without waiving the benefits of his acceptance.

The purpose of punitive damages is stated in *Malco,* at page 66: "Punitive damage is given on the basis of punishment to the injured party not because he has been injured, which injury has been compensated with compensatory damages, but to punish the wrongdoer for his malice and to deter others from like conduct. Punitive damage ought to serve its purpose. Consideration should be given to the wrongdoer's ability to pay and the grievousness of his acts, the degree of malicious intention, and potential damage which might have been done by such acts as well as the actual damage." *See also: Gladfelter v. Doemel* (1958), 2 Wis. 2d 635, 647, 87 N. W. 2d 490; *Kink v. Combs* (1965), 28 Wis. 2d 65, 79, 135 N. W. 2d

789. The trial court in reducing the punitive damage considered $75,000 would represent a reasonable amount in light of this test and "the relentless pursuit of defendant's malevolent designs almost to the eve of trial." Since the trial court considered the wealth of Meister to be approximately two and a half million dollars, it thought a lesser amount would not accomplish the purpose of being punitive and deterrent in nature and a higher amount might well be regarded as a result of overreaction by way of penalty. We agree.

While there is no arithmetic proportion to which punitive damages should relate to the wealth of the defendant or to the damage done the plaintiff, we think punitive damages in an amount equal to compensatory damages founded on special harm is reasonable. While $10,000 may be the highest amount heretofore approved by this court for punitive damages, *Lisowski v. Chenenoff* (1968), 37 Wis. 2d 610, 155 N. W. 2d 619, this court has set no arbitrary maximum. In *Malco* punitive damages of approximately seven and one-half percent of the defendant's wealth was approved. In *Fuchs v. Kupper* (1963), 22 Wis. 2d 107, 125 N. W. 2d 360, an award of twelve and one-half percent was approved.

In his last argument, Meister contends the evidence presented concerning his net worth was incompetent because it did not relate in any meaningful way to the defendant's net worth at the time of trial. The evidence was not objected to by Meister at the time it was presented nor was this issue raised by motions after verdict; hence, the issue may not be raised now as a matter of right.

However, due to the importance of the question, we will briefly discuss the question of law involved. A defendant's worth for the purpose of determining punitive damages need not be determined exactly as of the day of trial and needs only to be reasonably accurate. The evidence that Meister's net worth was between two and two

and one-half million dollars was obtained on adverse examination eight months and three and a half months prior to trial. This was the net worth of Meister at that time by his own admission.

Meister argues that in the interval between taking his deposition and the time of trial his economic situation could very well have been changed. So far as the record is concerned this is speculation. Meister did not put in any evidence of his wealth at any time and he did not appear at the trial until Dalton had rested his case. Whether this was to prevent Dalton from examining him as to his wealth, we do not know. The evidence of wealth admitted is relevant and can stand unless refuted. If Meister had suffered financial reversals during the interval, such evidence would also be admissible as being material. But it is asking too much by way of proof to require the plaintiff to give an accurate balance-sheet appraisal of the defendant's wealth as of the date of trial. Since we are of the opinion the judgment appealed from should be affirmed, this requires Dalton's motion for review be denied.

While this case was awaiting oral argument, the United States Supreme Court decided *Rosenbloom v. Metromedia* (1971), 403 U. S. 29, 91 Sup. Ct. 1811, 29 L. Ed. 2d 296, in which the majority of the court held in a plurality of opinions that the doctrine of *New York Times Co. v. Sullivan* (1964), 376 U. S. 254, 84 Sup. Ct. 710, 11 L. Ed. 2d 686, applied to a state's civil libel action brought by a private individual for a defamatory falsehood uttered by a news media concerning the individual's involvement in an event of public or general interest. This case is not applicable here. The instant case was tried under the current libel laws as discussed in *Lathan v. Journal Co.* (1966), 30 Wis. 2d 146, 140 N. W. 2d 417, and in *Ranous v. Hughes* (1966), 30 Wis. 2d 452, 141 N. W. 2d 251. Dalton was a public figure. The

subject matter of the libel was of public or general interest and Meister was recognized as having a "conditional privilege" of commenting. The case was tried under the "greater weight" of the evidence standard of proof and the jury found the defamatory statements were untrue and Meister abused his privilege because the statements were made with malice and knowledge of their falsity.

The *Times-Sullivan* rule recognized the constitutional guaranties of freedom of speech and of press place limitations upon state libel laws. Two important limitations in cases involving public interest seem to be: (1) The standard of proof is not the greater weight of the evidence but the "clear and convincing proof,"—this to give the freedoms "adequate breathing space;" and (2) negligence is out as a basis of liability and a willfulness based on knowledge is a substitute, *i.e.*, the defamatory falsehood must be published with knowledge that it is false or with reckless disregard of whether it was false or not.

The *Times-Sullivan* rule is not confined to news media and free press but also applies to private individuals and free speech in some cases. *See St. Amant v. Thompson* (1968), 390 U. S. 727, 88 Sup. Ct. 1323, 20 L. Ed. 2d 262, an action by a deputy sheriff against a defeated candidate for the United States Senate; *Lynn v. Plant Guard Workers* (1966), 383 U. S. 53, 86 Sup. Ct. 657, 15 L. Ed. 2d 582, an action by an official of an employer against the labor union. While two of the justices of the United States Supreme Court see constitutional overtones in awarding punitive damages and would strike down such damages on constitutional grounds and allow only damages for actual losses, the court in *Rosenbloom* did not reach that question. Neither that question nor the burden-of-proof issue was raised in this case, but we might observe that even a casual reading of this

record would lead one to believe as a matter of law that the proof of malice and knowledge of falsity or the reckless disregard of the truth was by clear and convincing evidence.

*By the Court.*—Judgment affirmed and motion for review denied.

ROBERT W. HANSEN, J. (*dissenting*). The majority affirms the judgment in an action in which:

* the plaintiff, a prominent public official,
* brought suit for damages for defamation of character
* against the defendant, a well-known private citizen,
* based on alleged defamatory statements referring to plaintiff as a ringleader, a "gestapo leader," and as having illegally constituted the grand jury that indicted defendant on bribery charges,
* made by the defendant following dismissal of criminal proceedings brought against the defendant by grand jury indictment,
* the jury awarding the plaintiff $200,000 in punitive damages, and $75,000 in compensatory damages,
* the trial court letting stand the $75,000 in compensatory damages but reducing to $75,000 the punitive damages.

So we have a libel action brought by a public official against a private citizen on the basis of allegedly defamatory statements concededly related to his official conduct of his official duties.

The right to freely criticize government and those who administer its affairs is a hallmark of our free and democratic republic.[1] Our commitment is to full and

---

[1] "The protection given speech and press was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Roth v. United*

free debate and discussion, not to repression, direct or indirect.[2] Recognition of the right to criticize those who carry on the functions of government without fear of repercussion came early in our history.[3] Recognition of such right to criticize the conduct of public affairs, in part at least, prompted the constitutional protection

*States* (1957), 354 U. S. 476, 484, 77 Sup. Ct. 1304, 1 L. Ed. 2d 1498.

*See also: Stromberg v. California* (1931), 283 U. S. 359, 369, 51 Sup. Ct. 532, 75 L. Ed. 1117. ". . . The maintenance of the opportunity for free political discussion to the end that government may be responsive to the will of the people and that changes may be obtained by lawful means, an opportunity essential to the security of the Republic, is a fundamental principle of our constitutional system. . . ."

[2] "Thus we consider this case against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials. . . ." *New York Times Co. v. Sullivan* (1964), 376 U. S. 254, 270, 84 Sup. Ct. 710, 11 L. Ed. 2d 686.

". . . We honor the commitment to robust debate on public issues, which is embodied in the First Amendment, by extending constitutional protection to all discussion and communication involving matters of public or general concern, without regard to whether the persons involved are famous or anonymous." *Rosenbloom v. Metromedia* (1971), 403 U. S. 29, 43, 91 Sup. Ct. 1811, 29 L. Ed. 2d 296.

[3] ". . . The American Colonists were not willing, nor should we be, to take the risk that '[m]en who injure and oppress the people under their administration [and] provoke them to cry out and complain' will also be empowered to 'make that very complaint the foundation for new oppressions and prosecutions.' *The Trial of John Peter Zenger*, 17 Howell's St. Tr. 675, 721–722 (1735) (argument of counsel to the jury). To impose liability for critical, albeit erroneous or even malicious, comments on official conduct would effectively resurrect 'the obsolete doctrine that the governed must not criticize their governors.' " Mr. Justice GOLDBERG, concurring in result, in *New York Times Co. v. Sullivan, supra,* at page 301.

given free speech and freedom of the press [4] in the first amendment of the United States Constitution.[5] Where public officials are concerned, or where public matters are involved, libel actions have an evident impact upon the right or willingness of citizens to criticize the holders of public office or the conduct of public affairs.[6] If such possible impingement of libel actions brought by public officials as to official conduct criticisms was not before obvious, it was made clear in *New York Times Co. v. Sullivan, supra,* holding that ". . . the Constitution delimits a State's power to award damages for libel in actions brought by public officials against critics of their official conduct. . . ." [7]

In *Sullivan,* the nation's highest judicial tribunal raised the threshold of proof required in libel actions brought

[4] *See: A Constitutional Faith,* Hugo LaFayette Black, Associate Justice, United States Supreme Court, at page 49:

"Free speech plays its most important role in the political discussions and arguments which are the lifeblood of any representative democracy. The lesson of history is crystal clear that the decline of really free political debate is one of the first signs of deterioration in an otherwise free state. Our Founding Fathers recognized this and established a system of government with its written Constitution and Bill of Rights which they believed ensured absolute freedom to any citizen to say anything and believe anything, even if that belief was contrary to our most sacred principles of government and society. Jefferson explained it this way on the occasion of his first inauguration as President of the United States:

" 'If there be any among us who would wish to dissolve this Union or to change its republican form, let them stand undisturbed as monuments of the safety with which error of opinion may be tolerated where reason is left free to combat it.' [Thomas Jefferson, First Inaugural Address, March 4, 1801]"

[5] Art. I, U. S. Const., providing:

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

[6] *New York Times Co. v. Sullivan, supra,* at pages 272, 273.

[7] *Id.* at page 283.

by public officials where official conduct, not private conduct,[8] was involved, by holding that first amendment rights of free speech and press prohibit ". . . a public official from recovering damages for a defamatory false-hood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless dis-regard of whether it was false or not. . . ."[9] For the same constitution-based reason, the higher requirement as to proof was extended to libel actions brought by public figures [10] and persons involved in public events of legitimate public interest.[11]

Individual justices of the highest appellate court have, in plurality, concurring and dissenting opinions, pro-posed additional safeguards for freedoms of speech and press against impairment by libel suits brought by public officials or public personalities. These include denying to public officials any right to bring libel suits based on criticism of their official conduct;[12] interpreting the

---

[8] "This is not to say that the Constitution protects defamatory statements directed against the private conduct of a public official or private citizen. . . ." Mr. Justice GOLDBERG, concurring in re-sult, joined by Mr. Justice DOUGLAS, in *New York Times Co. v. Sullivan, supra,* at page 301.

[9] Mr. Justice BRENNAN, in plurality opinion, *New York Times Co. v. Sullivan, supra,* at pages 279, 280.

[10] *See: Associated Press v. Walker* (1967), 388 U. S. 130, 87 Sup. Ct. 1975, 18 L. Ed. 2d 1094 (retired Army general against a wire service); *Curtis Publishing Co. v. Butts* (1967), 388 U. S. 130, 87 Sup. Ct. 1975, 18 L. Ed. 2d 1094 (former football coach against publisher of magazine); *Beckley Newspaper Corp. v. Hanks* (1967), 389 U. S. 81, 88 Sup. Ct. 197, 19 L. Ed. 2d 248 (court clerk against newspaper); *Greenbelt Publishing Asso. v. Bresler* (1970), 398 U. S. 6, 90 Sup. Ct. 1537, 26 L. Ed. 2d 6 (state representative and real estate developer against publisher of newspaper); *Ocala Star-Banner Co. v. Damron* (1971), 401 U. S. 295, 91 Sup. Ct. 628, 28 L. Ed. 2d 57 (defeated candidate for tax assessor against publisher of newspaper).

[11] *Rosenbloom v. Metromedia, supra.*

[12] "If the government official should be immune from libel actions so that his ardor to serve the public will not be dampened

first amendment so that ". . . at the very least it leaves the people and the press free to criticize officials and discuss public affairs with impunity;" [13] insuring that ". . . the purpose and effect of the law is to redress actual and measurable injury to private individuals that was reasonably foreseeable as a result of the publication;" [14] restricting the award of damages in libel actions brought by public officials to ". . . proven, actual injuries . . . based on essentially objective, discernible factors.

. . . then the citizen and the press should likewise be immune from libel actions for their criticism of official conduct. Their ardor as citizens will thus not be dampened and they will be free 'to applaud or to criticize the way public employees do their jobs, from the least to the most important.' If liability can attach to political criticism because it damages the reputation of a public official as a public official, then no critical citizen can safely utter anything but faint praise about the government or its officials. The vigorous criticism by press and citizen of the conduct of the government of the day by the officials of the day will soon yield to silence if officials in control of government agencies, instead of answering criticisms, can resort to friendly juries to forestall criticism of their official conduct." Mr. Justice GOLDBERG, concurring in result, joined by Mr. Justice DOUGLAS, in *New York Times Co. v. Sullivan, supra,* at page 304.

[13] ". . . To punish the exercise of this right to discuss public affairs or to penalize it through libel judgments is to abridge or shut off discussion of the very kind most needed. This Nation, I suspect, can live in peace without libel suits based on public discussions of public affairs and public officials. But I doubt that a country can live in freedom where its people can be made to suffer physically or financially for criticizing their government, its actions, or its officials." Mr. Justice BLACK, concurring, joined by Mr. Justice DOUGLAS, in *New York Times Co. v. Sullivan, supra,* at page 297.

[14] Mr. Justice HARLAN, dissenting, in *Rosenbloom v. Metromedia, supra,* also holding, "Given the defense of truth, it is my judgment that, in order to assure that it promotes purposes consistent with First Amendment values, the legitimate function of libel law must be understood as that of compensating individuals for actual, measurable harm caused by the conduct of others. . . ." (p. 66).

. . ." [15] Summarizing the present state of the law in this area, one Justice recently stated:

". . . [I]t would seem that at least five members of the Court would support each of the following rules:

"For public officers and public figures to recover for damage to their reputations for libelous falsehoods, they must prove either knowing or reckless disregard of the truth. All other plaintiffs must prove at least negligent falsehood, but if the publication about them was in an area of legitimate public interest, then they too must prove deliberate or reckless error. In all actions for libel or slander, actual damages must be proved, and awards of punitive damages will be strictly limited." [16]

If the Justice WHITE summarization of the present constitutional mandate controlling libel suits brought by public officials in the area of their official duties is accurate, the writer would hold that it was substantially followed in the case before us as to the standard of proof required. (While the question as to malice submitted to the jury related only to punitive damages, and the test was given as "reckless disregard" rather than "knowing or reckless disregard," no prejudice to the defendant derives from the variance.) However, the $75,000 punitive damages award was, in this writer's opinion, not "strictly limited," and the award of $75,000 in compensatory damages was based, almost entirely on presumed, rather than actual damages. The writer would ground reversal and order a new trial on the issue of damages,

---

[15] Mr. Justice MARSHALL, dissenting, joined by Mr. Justice STEWART, in *Rosenbloom v. Metromedia, supra,* adding: ". . . If awards are so limited . . . it will be unnecessary to rely, . . . on somewhat elusive concepts of the degree of fault, and unnecessary, for constitutional purposes, to engage in ad hoc balancing of the competing interests involved. States would be essentially free to continue the evolution of the common law of defamation and to articulate whatever fault standard best suits the State's need." (p. 86).

[16] Mr. Justice WHITE, concurring, in *Rosenbloom v. Metromedia, supra.* (p. 59).

not on a constitutional basis but. on the ground of sound public policy reflecting a respect for the constitutional values arguably adversely affected by the basis for awarding damages used in this case.

Like Topsy, the law of libel and slander has "jest growed," [17] and nowhere is this more evident than in the awarding of damages in defamation cases. Without attempting a perhaps overdue re-evaluation of barnacles that have attached themselves to the hull over the years, [18] a re-examination of the basis for damage awards in libel cases brought by public officials involving their official conduct is in order. Analysis begins with restating the stated goal of courts in awarding damages for tortious injury or for breach of a contractual promise: *i.e.*, putting the plaintiff in the same financial position he was prior to the tort or breach of contract. [19] Pre-

[17] "It must be confessed at the beginning that there is a great deal of the law of defamation which makes no sense. It contains anomalies and absurdities for which no legal writer ever has a kind word. . . . The explanation is in part one of historical accident and survival, in part one of the conflict of opposing ideas of policy in which our traditional notions of freedom of expression have collided violently with . . . indignation at the maligning tongue." Prosser, *Law of Torts* (Hornbook series 4th ed.), ch. 19, Defamation, page 737.

[18] "The actions for defamation developed according to no particular aim or plan. . . ." *Id.* at page 737.

". . . No very comprehensive attempt ever has been made to overhaul and untangle this entire field of law, and, unhappily, there seems to be none in prospect." *Id.* at page 739.

[19] "Compensation is the stated goal of courts in awarding damages for tortious injury or for breach of a contractual promise. . . .

"However, even with all its shortcoming compensation of the plaintiff remains the best expression of the goal of the damage remedy. This principle forms a limiting force on jury verdicts and indicates that American ideas of justice begin by placing emphasis, not on retribution, but on compensation. . . ." 22 Am. Jur. 2d, *Damages*, p. 28, sec. 12, Compensation as the general rule or objective.

sumably serving such basic purpose, three categories of damages have come to be awardable in libel and slander actions: (1) punitive or exemplary damages; (2) special damages, such as loss of business, recoverable only upon proof of loss; and (3) general damages, which the law has come to presume to follow inevitably from defamatory imputation, and which are often recoverable without proof of injury.[20]

As a result of the judge-added permitting of unmeasurable punitive and presumed damage award, unrelated to actual injuries sustained, it is true, as Justice MARSHALL points out in *Metromedia*, that:

"The judgments that may be entered in defamation cases are unlike those that may be entered in most litigation since the bulk of the award is given to punish the defendant or to compensate for presumed damages. . . ."[21]

These near-twin doctrines, representing a double windfall beyond truly compensatory damages, to plaintiffs in defamation actions, as Mr. Justice MARSHALL points out, ". . . allow substantial damages without even an offer of evidence that there was actually injury. . . ."[22] Of the permitting "presumed" damages before us on this appeal, it can be said, as Mr. Justice MARSHALL said of the libel action against *Metromedia*: ". . . There is no requirement that there be even an offer of proof

[20] 50 Am. Jur. 2d, *Libel and Slander*, Damages, In General, p. 868, sec. 349.

[21] Mr. Justice MARSHALL, dissenting, joined by Mr. Justice STEWART, in *Rosenbloom v. Metromedia*, at page 82.

[22] *Id.* at page 83, adding: "The unlimited discretion exercised by juries in awarding punitive and presumed damages compounds the problem of self-censorship that necessarily results from the awarding of huge judgments. This discretion allows juries to penalize heavily the unorthodox and the unpopular and exact little from others. . . . These awards are not to compensate victims; they are only windfalls. . . ." *Id.* at page 84.

that there was in fact financial loss, physical or emotional suffering, or that the plaintiff's standing in the community was diminished. The effect is to give juries essentially unlimited discretion and thus give the jury much the same power they exercise under the labels of punitive or exemplary damages. The impingement upon free speech is the same no matter what label is attached." [23]

As to the permitting of punitive damage awards in libel or slander actions, Mr. Justice MARSHALL traces their origin to a long-ago era of long abandoned complete jury discretion,[24] correctly terming such punitive damages as ". . . in effect private fines," [25] he finds them constitutionally inappropriate in libel cases brought by public officials or public figures for the reason that ". . . fear of the extensive awards that may be given under the doctrine must necessarily produce the impingement on freedom of the press. . . ." [26] So, on such constitu-

---

[23] *Id.* at page 83.

[24] ". . . The concept of punitive or exemplary damages was first articulated in *Huckle v. Money,* 2 Wils. 205, 95 Eng. Rep. 768 (K. B. 1763)—one of the general warrant cases. There Lord Camden found that the power to award such damages was inherent in the jury's exercise of uncontrolled discretion in the awarding of damages. See 1 T. Sedgwick, Damages, secs. 347–350 (9th ed. 1912). Today these damages are rationalized as a way to punish the wrongdoer and to admonish others not to err. See Morris, Punitive Damages in Tort Cases, 44 Harv. L. Rev. 1172 (1941)." *Id.* at page 82.

[25] ". . . Here the jury awarded Mr. Rosenbloom $725,000 in punitive damages. This huge sum was not given to compensate him for any injury but to punish Metromedia. . . . Thus they serve the same function as criminal penalties and are in effect private fines. Unlike criminal penalties, however, punitive damages are not awarded within discernible limits but can be awarded in almost any amount. Since there is not even an attempt to offset any palpable loss and since these damages are the direct product of the ancient theory of unlimited jury discretion, the only limit placed on juries in awarding punitive damages is that the damages not be 'excessive.' . . ." *Id.* at page 82.

[26] *Id.* at page 83.

tional ground, Mr. Justice MARSHALL, joined by Mr. Justice STEWART, would eliminate both presumed and punitive damages in the special category with which we here deal:

"The threats to society's interest in freedom of the press [NOTE: the writer would add freedom of speech as likewise involved.] that are involved in punitive and presumed damages can largely be eliminated by restricting the award of damages to proved, actual injuries. The jury's wide ranging discretion will largely be eliminated since the award will be based on essentially objective, discernable factors. And the self-censorship that results from the uncertainty created by the discretion as well as the self-censorship resulting from the fear of large judgments themselves would be reduced. At the same time society's interest in protecting individuals from defamation will still be fostered. The victims of the defamation will be compensated for their real injuries. They will not be, however, assuaged far beyond their wounds." [27]

The majority of our court says of the MARSHALL-STEWART holding, that actual damages only can be awarded in libel suits brought by public officials relating to official conduct, that "the court in *Rosenbloom* did not reach that question." That is not quite accurate. The plurality opinion, written by Mr. Justice BRENNAN, joined by the Chief Justice and Mr. Justice BLACKMUN, note that "Our Brothers HARLAN and MARSHALL . . . would also limit any recovery to 'actual' damages." Their sole objection is that ". . . that standard, too, leaves the First Amendment insufficient elbow room within which to function. It is not simply the possibility of a judgment for damages that results in self-censorship. The very possibility of having to engage in litigation, an expensive and protracted process, is threat enough to cause discussion and debate to 'steer far wider of the

[27] *Id.* at page 84. *See also: Jones v. Fisher* (1969), 42 Wis. 2d 209, 166 N. W. 2d 175 (dissenting opinion by the writer).

unlawful zone' thereby keeping protected discussion from public cognizance. . . . Too, a small newspaper suffers equally from a substantial damage award, whether the label of the award be 'actual' or 'punitive.' " [28] The only doubt expressed is that the MARSHALL-STEWART recommendation for limiting damages to actual, proven damages will go far enough to protect constitutionally assured rights of free speech. Nowhere, in any of the opinions in *New York Times* or *Metromedia* is there any difference as to the goal: assuring that first amendment rights of free speech and press will somehow be protected against invasion by libel suits brought by public officials against critics of their performance of their official duties. In determining a proper public policy, the unanimity as to the goal is not to be ignored by differences as to how best to reach it.

What is puzzling to the writer about the majority opinion of our court is that, except for observing that the quantum of proof required by the *New York Times Co. Case* in libel actions brought by public officials against critics of their official conduct was met, it treats this case exactly like any other libel or slander action. It treats both *New York Times* and *Metromedia* as if they were concerned solely with burden of proof, rather than with a deeply disturbing question of public policy and constitutional implications—how to best limit libel suits by public officials and public figures so that there is no "chilling effect" [29] upon the right of citizens and press to comment and criticize the conduct of public affairs. The majority of our court appears to feel that the added requirement of establishing malice in cases

[28] Mr. Justice BRENNAN, in plurality opinion, *Rosenbloom v. Metromedia*, at page 52.

[29] ". . . The opinion of the Court conclusively demonstrates the chilling effect of the Alabama libel laws on First Amendment freedoms. . . ." Mr. Justice GOLDBERG, concurring in result, joined by Mr. Justice DOUGLAS, in *New York Times Co. v. Sullivan, supra,* at page 300.

brought by public officials for libel against their critics is a sufficient protection for the right to speak freely about government and its officials. The writer does not share the faith. At best it is an "evanescent protection."[30] The verbal blows exchanged in the heat of public debate and controversy are as unlikely to be accompanied by goodwill or good intentions as are their fistic equivalents in the prizefight ring. The dividing line between malice and indignation can be paper-thin, especially in a courtroom months after the heat of the moment has passed. From the standpoint of public policy, full freedom of political debate and discussion is better, or at the least, additionally well served by limiting a public official in a libel action to recovering his actual damages. This is so particularly because anyone who assumes a position of prominence as a public official or public personality knows very well, in advance, that verbal brickbats are as likely to come his way as verbal bouquets.[31] It is this near unavoidable concomitant of public or governmental prominence that led to the admonition, "If you can't stand the heat, get out of the kitchen." Where a public official or public figure elects to stay near the stove, he can expect to get some heat. Where the heat he endures as to his official conduct can be established to be produced with a "knowing and reckless disregard of the truth," sound public

[30] " 'Malice' . . . is an elusive, abstract concept, hard to prove and hard to disprove. The requirement that malice be proved provides at best an evanescent protection for the right critically to discuss public affairs . . . ." Mr. Justice BLACK, concurring, joined by Mr. Justice DOUGLAS, in *New York Times Co. v. Sullivan, supra,* at page 293.

[31] ". . . In a democratic society, one who assumes to act for the citizens in an executive, legislative or judicial capacity must expect that his official acts will be commented upon and criticized. Such criticism cannot, in my opinion, be muzzled or deterred by the courts at the instance of public officials under the label of libel." Mr. Justice GOLDBERG, concurring in result, joined by Mr. Justice DOUGLAS, in *New York Times Co. v. Sullivan, supra,* at page 299.

policy permits him to sue for and recover in a libel action his actual, provable damages with no presumed or punitive damages to be added. Since both presumed damages and punitive damages are judicial inventions, not legislative creations, the writer would find the public policy best served by denying their applicability at least in this limited and special category of libel and slander cases: those brought by public officials against their critics.

Justices MARSHALL and STEWART would reach the same result on constitutional grounds, holding the first amendment protections to free speech and press to require that in libel actions brought by public officials or public figures related to official duties or matters of public interest, damages must be limited to actual damages, with neither presumed nor punitive damages to be permitted. The writer does not find their interpretation to be a constitutionally based mandate to state courts; neither did their colleagues. However, the writer finds their arguments unanswerable and their reasoning more than persuasive, and would, as sound public policy, adopt their conclusion that in libel actions brought by public officials against critics of their official functioning, damages be limited to those actual or special damages that reflect the loss or injuries in fact sustained by the public official-plaintiff, including loss of income, physical or emotional suffering, loss of standing in profession or community, expenses, and provable future injury, but not including either presumed or punitive damages.

Applying such restricted standard as to awardable damages to the judgment in the case before us would require striking from it the $75,000 award of punitive damages. As to what portion of the $75,000 award for compensatory damages represents presumed damages, it is not possible to do more than to find from the record that a major share of it does. The respondent's

brief, urging affirmance of the judgment, as to compensatory damages, states that ". . . the law furnishes no legal rules for measuring them," a claim of virtue that the writer sees as the exact vice. Respondent's counsel relies almost entirely upon a 1914 Wisconsin case dealing with presumed damages [32] as warranting affirmance of the compensatory damages award. The reference and reliance are understandable for it is evident that presumed damages are a major (if unmeasurably so) portion of the compensatory damages award. This being so, the writer would reverse and remand for a new trial on the issue of damages only, such determination of damages not to include either punitive or presumed damages and to be limited to actual damages, including loss of income, physical or emotional suffering, diminution of standing in profession or community, expenses and probable future losses, so that a victim of a defamation who is a public official with his official duties the target of the defamatory remarks "will be compensated for . . . [his] real injuries," but ". . . will not be, however, assuaged far beyond . . . [his] wounds." [33]

I am authorized to state that Mr. Justice LEO B. HANLEY joins in this dissenting opinion.

[32] *Williams v. Hicks Printing Co.* (1914), 159 Wis. 90, 150 N. W. 183.

[33] Mr. Justice MARSHALL, dissenting, joined by Mr. Justice STEWART, in *Rosenbloom v. Metromedia, supra,* at page 84.