CALERO, Respondent, v. DEL CHEMICAL CORPORATION and another, Appellants.*

*No. 463. Argued March 6, 1975.—Decided May 8, 1975.*
(Also reported in 228 N. W. 2d 737.)

---

* Motion for rehearing denied, with costs, on July 8, 1975.

For the appellants there were briefs and oral argument by *Joseph P. Balistrieri* of Milwaukee.

For the respondent there was a brief and oral argument by *Jack L. Goodsitt* of Milwaukee.

DAY, J. This is an appeal from a judgment of the trial court, following a jury trial, awarding damages to Mr. Mario Calero (plaintiff-respondent) against Robert C. Bagemihl (defendant-appellant) and his employer Del Chemical Corporation (Del Chemical—defendant-appellant). Mr. Bagemihl was found by the jury to have communicated defamatory oral or written statements about the plaintiff to prospective employers of the plaintiff. A judgment was entered for damages. The defendants also appeal from the decision and order denying the defendants' post-trial motions. The issues raised are discussed in this opinion.

At the time the case was tried the plaintiff was a married, fifty-year-old, college-trained public accountant, who was then living and working in Arizona. In November of 1964, the plaintiff, who had previously been employed as an accountant for various companies, applied for a position with Del Chemical and was interviewed and hired by Mr. Bagemihl. Plaintiff began work on November 16, 1964, as a general accountant and assistant to Mr. Bagemihl at $135 a week. From November 16, 1964, to November 2, 1967, the plaintiff received 11 consecutive raises and finally earned $240 per week and was the director of purchasing. As director of purchasing the plaintiff designed and prepared an index file of purchasing records to guide him in his negotiations with suppliers. These were put on 11 by 8½ inch cards and contained pertinent information relating to the purchase of raw materials for the corporation. The plaintiff initiated this system and by the fall of 1967 there were approxi-

mately 150 of such cards which were kept in his office and to which his secretary also had access.

The plaintiff testified that on November 1, 1967, he had been subjected to verbal abuse by the company president and left the office and went home. That evening he sent a telegram to Mr. Bagemihl, informing him that pursuant to company policy he was taking a week's vacation. The next day the plaintiff informed Mr. Bagemihl that he had quit and was looking for other employment. Mr. Bagemihl accepted the plaintiff's resignation but asked him to stay on to train a replacement and stated he would be paid for vacation time and receive severance pay if he would do so. Plaintiff agreed to do this and arrived at the corporation the following morning to train his replacement who was already occupying the plaintiff's desk. He continued to work at the corporation the following week. The plaintiff testified that on Friday, November 10, 1967, he received a call at work from one Richard Danen, a Del Chemical accountant who was recently transferred to Reno, Nevada, to set up the same purchasing procedures for an affiliated company there as the plaintiff had done for the company in Wisconsin. Mr. Danen requested copies of the purchasing records in the file-card system that the plaintiff had designed. Immediately thereafter the plaintiff began photocopying the cards in the presence of others in the office and was in no way secretive about such copying. After he had completed 100 of the cards, he put them on a shelf in his office and took none off the premises. He testified that the following Monday morning, November 13th, when he arrived at work, his secretary told him to go directly to Mr. Bagemihl's office. Mr. Bagemihl told him to leave the premises and that he was dismissed because Mr. Bagemihl had heard that he was starting a competing company, was attempting to hire away various key personnel of the corporation and was "helping himself" to confidential corporate records about suppliers. The plain-

tiff testified that when so accused by Mr. Bagemihl he denied the allegations and said he was copying the purchasing records at the express request of Mr. Danen in Reno. The plaintiff said he then went to his office with Mr. Bagemihl and handed to him the copies of the file cards he had made the preceding Friday. At Mr. Bagemihl's request, he surrendered his corporate car keys, credit card and office keys, took a cab home and never returned to the corporate offices.

Mr. Bagemihl testified that upon accusing the plaintiff, the plaintiff made no response or explanation whatever and did not deny any of the charges. Mr. Bagemihl could not recall the plaintiff mentioning anything about Danen. Furthermore, he testified that when he went to the plaintiff's office, the plaintiff did not give him the copies of the purchasing cards but gave him only his keys and credit card. Mr. Bagemihl said that he made no request for a return of the cards. Mr. Bagemihl admitted he had no personal knowledge whatever as to plaintiff's starting a competing business, hiring away employees, or copying records. He testified he first heard the plaintiff was starting a competing business the week before November 13th from several other employees. He did not discuss it with the plaintiff then although he termed it a "pretty well-known office rumor." He testified that he was told that the plaintiff and James Nooyen, another employee, were starting a competing business and both were fired November 13, 1967. Mr. Bagemihl also admitted he made no attempt to investigate or verify any of these reports. He said he had no reason to doubt the truthfulness of his informants and so he did nothing but listen to the people who confided in him. Both the plaintiff and Mr. Nooyen denied that they had taken any steps to organize or participate in a competing business on or before November 13th. The record does contain articles of incorporation for an American Municipal Chemical Corporation dated November 18, 1967, signed by the plaintiff and Mr.

Nooyen. Mr. Nooyen testified that he and the plaintiff decided after they were fired that for financial reasons they should start a company. Mr. Nooyen, however, testified that about a week after signing the corporate papers he backed out of the operation altogether because he felt he needed more money.

The plaintiff's testimony was that he believed there were two such corporations; he said the one of November 18th was really Mr. Nooyen's idea but that it ended quickly and that in December of 1967, the plaintiff joined with some friends unconnected with the Del Chemical Corporation and tried to start another enterprise with the same name. He said that the new company started in earnest in January of 1968, with the plaintiff as the president. He worked for that company until June of 1968, without compensation, and then left the firm. Mr. Nooyen was never involved in that business. While the American Municipal Chemical Corporation was in the same business as Del Chemical after it began in January, 1968, both the plaintiff and Mr. Nooyen denied that prior to November 13, 1967, when they were discharged from Del Chemical, that they were organizing any competing business. The sources of Mr. Bagemihl's information appear to have been rumors relayed to him by two secretaries. Another employee, Gary Umhoefer, is the source of the information regarding Mr. Nooyen's supposed solicitation of Mr. Umhoefer for employment.

There is no evidence in the record that the plaintiff ever tried to get "key" or other personnel to leave Del Chemical Corporation. The plaintiff specifically denied it. Mr. Bagemihl again relied on informants within the office and he admitted he made no effort to verify reports about soliciting employees. Mr. Nooyen testified that his conversation with Mr. Umhoefer involved only a possibility at most and that he had no intention at that time of starting a competing business.

The plaintiff denied in his testimony that he was "helping himself" to confidential corporation records for his private use. Again Mr. Bagemihl admitted he had no direct personal experience with which to support this charge. He stated that others had told him that the plaintiff was copying corporate records and he believed them. He said when he first fired the plaintiff he was under the impression the plaintiff was removing the records from the premises, but then admitted his informants had told him only that they had seen the plaintiff copying the records during working hours. This was done in plain view. None had told him that they had seen the plaintiff leaving with the records. Mr. Bagemihl also admitted he made no attempt to ascertain from those seeing the plaintiff copying the records any reason as to why the plaintiff may have been doing so. Mr. Bagemihl testified that he could not recall having asked Mr. Danen anything about it, nor could he recall Mr. Danen telling him anything about the records.

Mr. Danen, on the other hand, said in a deposition in Reno on September 22, 1973, that he had spoken to Mr. Bagemihl before going to Reno about getting copies of the cards and that Mr. Bagemihl had not voiced objection. He said that he did call the plaintiff after arriving in Reno and requested copies of the cards. He said that he also spoke to Mr. Bagemihl about the cards sometime after arriving in Reno and eventually did receive copies either in November or December.

There was testimony from secretaries of the company that the plaintiff had also asked for some cards referred to as formulation cards, but they, being suspicious, kept the cards from him and reported this fact to Mr. Bagemihl.

After leaving Del Chemical, the plaintiff was unemployed until January of 1968, when he began working, without compensation, for the company which he had

helped form (American Municipal Chemical Corporation). He remained there for six months. He then found employment as a general accountant with National Tape Distributors at $135 a week. By November of 1968, he was being considered for promotion to comptroller. His desk was just outside the door of the office of his superior and he heard this man call Mr. Bagemihl and ask about the plaintiff's work history. About fifteen minutes later, the plaintiff was called into his superior's office and his employment was terminated, effective immediately, and he was given a week's severance pay.

He was then unemployed for two months and obtained a job with the O. L. Schilffarth Company in January of 1969. During this time he averaged about five job applications a week. He was employed as comptroller at Schilffarth and made $10,000 a year but left in October of 1971, because the company went out of business. He then worked one month for $240 a week for First National Leasing Company. He listed Del Chemical as a previous employer on the application and he was terminated after one month when they reviewed his work history. He was then unemployed from November, 1971, until July of 1972, and in that period made over 200 job applications. On all of these he listed Del Chemical as a previous employer, never as a reference. When the plaintiff did find employment again in July of 1972, it was in Arizona and he testified he felt he had to leave Wisconsin to search for employment because Mr. Bagemihl's comments to prospective employers here were too harmful to overcome and he testified he felt demoralized and humiliated.

Included in the record are forms from three companies requesting information from Mr. Bagemihl about the plaintiff; these were filled out by Mr. Bagemihl in January and March of 1972, and stated that Mr. Bagemihl had:

". . . dismissed Mr. Calero when I learned he was starting a competing company, 'helping' himself to con-

fidential corporate records about suppliers and formulations and attempting to hire away from us various key personnel."

A fourth form, also completed by Mr. Bagemihl, states he would not consider rehiring the plaintiff and when asked to rate the plaintiff's character on a table from above average to unsatisfactory he wrote in "Yes—he was something of a character." On a form from the Internal Revenue Service where the plaintiff was being considered for a job in 1969, Mr. Bagemihl wrote the above-quoted explanation as the reason for his dismissal of the plaintiff. The plaintiff also testified that he had seen a communication to the retail credit bureau with comments from Mr. Bagemihl indicating that the plaintiff was a disloyal employee.

Mr. Bagemihl admitted at the trial that until these incidents of November of 1967, he considered the plaintiff to be a very good worker.

The trial was had before a jury in October of 1973, and the jury returned a verdict finding that Mr. Bagemihl had uttered or published defamatory statements concerning the plaintiff, that they were not substantially true and awarded damages of $3,000 for injuries to the plaintiff's feelings and to his general reputation and good name in the community, the sum of $7,000 for loss of income and punitive damages of $9,000.

The defendant's motions after verdict were denied on December 4, 1973, and the judgment on the verdict in favor of the plaintiff was entered for $19,000 damages and $572.80 costs on December 14, 1973. Defendants appeal from the whole of the judgment and the order.

The defendants in their brief raise three principal issues: (1) Did the trial court err in its instructions to the jury; (2) was there sufficient evidence to support the jury's verdict; and (3) were the damages awarded by the jury excessive?

The first issue the defendants allege is that the trial court erroneously instructed the jury in three respects:

(a) As to the quantum of proof necessary to overcome the conditional privilege extended to the defendants on this occasion; (b) as to the proper test applicable to determine if punitive damages are allowable; and (c) as to the quantum of proof necessary to satisfy the test for allowance of punitive damages.

The plaintiff very properly challenges the right of the defendants on this appeal to challenge the trial court's instructions as to the quantum of proof required to find express malice in this case for the reason that the issue was not properly raised in motions after verdict and therefore the trial court was never afforded an opportunity to respond.

Defendants submitted four proposed instructions at the close of the evidence, two of which read as follows:

"Before you find that Mr. Bagemihl defamed Mr. Calero you must find by clear and convincing proof that the statements uttered by Mr. Bagemihl were published with knowledge that they were false or with reckless disregard of whether they were false or not. *Polzin v. Helmbrecht,* 54 Wis. 2d 578."

"Before you are allowed to find punitive damages you must find by clear and convincing proof that Mr. Bagemihl acted with express malice. Express malice is ill will, envy, spite or revenge on the part of Mr. Bagemihl towards Mr. Calero."

Both of these instructions would require the clear and convincing quantum of proof. In the first instruction, which really goes to the issue of when a conditional privilege is abused, the instruction erroneously includes the constitutionally protected "actual malice" test as to what constitutes malice, which is not the standard for "express malice" discussed elsewhere in this opinion. While they do not seem to any longer explicitly argue that the trial court's refusal to so instruct was error, the defendants do argue that the evidence does not meet that test and that a new trial is required on that ground. In

the second instruction, only the common law or "express malice" test is proposed. After the instructions on this issue were read to the jury, the defendants objected that the quantum of proof on the punitive damages issue should be clear and convincing. No objection was made to lack of "actual malice" in the instruction. These alleged errors would, therefore, be preserved for appellate review if they had been properly raised again as grounds in the defendants' motions after verdict for a new trial. However, in that motion the defendants asserted only the most general grounds. They requested a new trial and said it should be granted because: (1) The verdict is contrary to law, and (2) contrary to the evidence; (3) the damages are excessive and due to jury bias; and (4) in the interest of justice. The only possible category the erroneous instructions would fall within is (1) above— that the verdict is contrary to the law.

It is clear that no error of the trial court is reviewable as a matter of right on appeal without first moving for a new trial based on such error. *Wells v. Dairyland Mut. Ins. Co.* (1957), 274 Wis. 505, 518, 80 N. W. 2d 380.

In *Kobelinski v. Milwaukee & Suburban Transport Corp.* (1972), 56 Wis. 2d 504, 517, 518, 202 N. W. 2d 415, this court said that the burden was on the moving party to demonstrate that the alleged error was specifically called to the attention of the trial court. This court said:

"Motions after verdict must state with particularity the alleged error so as to apprise the trial court of the alleged error and give it an opportunity to correct it, thereby avoiding a costly and time-consuming appeal. . . .

"The law is clear that the failure to point out with particularity the grounds for error in a motion after verdict constitutes a waiver of such errors. The trial court need not work on a generalization of error."

*See also: Mid-Continent Refrigerator Co. v. Straka* (1970), 47 Wis. 2d 739, 178 N. W. 2d 28; *Kiefer v. State Highway Comm.* (1970), 47 Wis. 2d 155, 177 N. W. 2d 66.

It is clear from the face of the defendants' motion that they provided the trial court with no more than a generalization of error. This was insufficient to apprise the trial court of the particular errors alleged in the instructions. The trial judge noted that defendants did not challenge the instructions either orally or by brief, so the attack on the verdict is treated by the trial court as a question of evidence sufficiency only. It is clear the defendants have waived the claimed errors in the instructions by failure to state them in motions for a new trial with sufficient particularity to bring them to the attention of the trial judge.

However, were we to consider the objections raised by the defendants, we would rule against them.

The trial court correctly held that the defendants' communications to prospective employers of the plaintiff, made at the request of those firms, were entitled to a qualified or conditional privilege. This court has previously considered the role of the conditional privilege in the law of defamation.

In *Lathan v. Journal Co.* (1966), 30 Wis. 2d 146, 152, 140 N. W. 2d 417, this court said:

"There are also certain occasions where a defamation is conditionally privileged. Conditional privileges or immunities from liability for defamation are based upon public policy which recognizes the social utility of encouraging the free flow of information in respect to certain occasions and persons, even at the risk of causing harm by the defamation."

The communications between the ex-employer and prospective employers in this case were the type of occasions contemplated in *Lathan*. There is social utility in encouraging the free flow of information between these two types of parties. This principle has been rec-

ognized by our court. In the case of *Hett v. Ploetz* (1963), 20 Wis. 2d 55, 59, 62, 121 N. W. 2d 270, a libelous letter from an ex-employer to a prospective employer, sent after the plaintiff had named the ex-employer as a personal reference, was held to be entitled to the conditional privilege:

"Ploetz was privileged to give a critical appraisal concerning his former employee so long as such appraisal was made for the valid purpose of enabling a prospective employer to evaluate the employee's qualifications. The privilege is said to be 'conditional' because of the requirements that the declaration be reasonably calculated to accomplish the privileged purpose and that it be made without malice."

"Public policy requires that malice not be imputed in cases such as this, for otherwise one who enjoys a conditional privilege might be reluctant to give a sincere, yet critical, response to a request for an appraisal of a prospective employee's qualifications."

The privilege enunciated here, however, is not absolute. It is conditional. As this court stated in *Otten v. Schutt* (1962), 15 Wis. 2d 497, 504, 113 N. W. 2d 152:

"The burden is on defendant to prove privilege as a defense to an action for defamation. 53 C. J. S., Libel and Slander, p. 332, sec. 220. 'When the defendant has established a *prima facie* case of privilege, it ordinarily devolves upon the plaintiff to rebut this showing by proof of actual malice, want of good faith, or due care, etc., where such matters are material.' 33 Am. Jur., Libel and Slander, p. 245, sec. 264. See also Restatement, 3 Torts, p. 299, sec. 613."

"Actual malice" in defamation cases refers to a constitutional standard that is something other than malice as such. As this court said in *Polzin v. Helmbrecht* (1972), 54 Wis. 2d 578, 587, 588, 196 N. W. 2d 685:

"At the outset it is important to note that there are two types of malice: 'Express malice' is that malice described in the jury instruction used in this case, that is 'ill will,

envy, spite, revenge,' etc.; the supreme court in *Rosen-bloom* also referred to this type of malice as 'common law malice.' 'Actual malice' (referred to in the *New York Times* case) is not malice at all, rather it is knowledge that a statement was false or published with reckless disregard of whether it was false or not. 'Actual malice' is what is required for a constitutional determination of libel under *New York Times*.

" 'Express' and 'actual' malice are very different concepts."

The term "actual malice" arises when there has been an abuse of a constitutional conditional privilege, *i.e.*, where one makes a defamatory statement "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan* (1964), 376 U. S. 254, 279, 280, 84 Sup. Ct. 710, 11 L. Ed. 2d 686, 95 A. L. R. 2d 1412.

The problem of actual malice arises in the cases involving first amendment protections afforded to the media such as newspapers, television and radio, or comments made about public officers or public figures. But the defamation alleged here falls within the nonconstitutional conditional privilege. In the constitutionally protected areas, the burden of proof before actual malice can be found is that there must be clear and convincing evidence. But in those areas alleging defamation that are not protected by first amendment constitutional considerations, the quantum of proof necessary is the greater weight of the evidence. It is for this reason that the defendant's reliance on *Polzin v. Helmbrecht, supra,* is misplaced, because the case falls within the first amendment protection where the malice that must be proved is of a different character and where the quantum of proof is likewise different. In *Polzin* the defendant was involved in a controversy about the Mayville sewage plant and wrote a letter to the editor of the paper criticizing one of the reporters. The letter suggested that the re-

porter may have been bribed. This court held that the defendant was entitled to the constitutional conditional privilege for the abuse of which one must show actual malice by clear and convincing evidence. As our court said, at page 586:

"We think critics of the media, like appellant here, are entitled to the same protections as were provided for the media in the *New York Times* and *Rosenbloom* cases. The defendant's letter discusses a matter of public concern . . . ."

This focus on the media and the "matter of public concern" which the court makes in this passage is the key to the distinction between constitutional and nonconstitutional conditional privileges in defamation law. This distinction is also made in Prosser, *Law of Torts* (4th ed. 1971), p. 785, sec. 115 (nonconstitutional) and p. 819, sec. 118 (constitutional). The distinction is implicit in the United States Supreme Court cases creating and applying the constitutional privilege. In the *New York Times Case*, an elected commissioner of the city of Montgomery, Alabama, sued the New York Times and four Alabama clergymen for libel. Mr. Sullivan was allegedly libeled by an advertisement in the New York Times which criticized the way Montgomery had handled various civil-rights activities. The Alabama state court verdict against the Times was reversed on certiorari. The court considered the defamation against the background of a firm national commitment to a free, open and robust debate on public issues and found that in the first amendment context a higher standard must be required, lest that free speech and open debate be chilled. The court held that a public official could not recover damages for a defamatory falsehood relating to his official conduct unless it was proved with "convincing clarity," p. 286; that such defamation was uttered with "actual malice" which is the knowing-or-reckless-falsity test discussed

above. The supreme court later extended this test beyond public officials to public figures as well. *Curtis Publishing Co. v. Butts* (1967), 388 U. S. 130, 87 Sup. Ct. 1975, 18 L. Ed. 2d 1094. It is clear, however, that the more exacting standard required to overcome the conditional privilege is based on fundamental first amendment considerations that arise from the danger of media self-censorship and the fear of a chilling effect on free expression and, as was said in the *New York Times Case*, page 272, the need to purge the " '. . . obsolete doctrine that the governed must not criticize their governors. . . .' "

In *Rosenbloom v. Metromedia* (1971), 403 U. S. 29, 91 Sup. Ct. 1811, 29 L. Ed. 2d 296, a plurality of the court held that, even though the suit against the news media was by a private person who was not a public official or public figure, nevertheless the protection afforded by the first amendment to the media applied, since the issue in the case (the enforcement of the obscenity laws) was of public interest. The opinion said, at pages 43 and 44:

"We honor the commitment to robust debate on public issues, which is embodied in the First Amendment, by extending constitutional protection to all discussion and communication involving matters of public or general concern, without regard to whether the persons involved are famous or anonymous."

The plurality opinion noted that while ordinarily the preponderance of the evidence is the quantum of proof necessary, in libel cases of this nature "convincing clarity" is required.

In *Gertz v. Robert Welch, Inc.* (1974), 418 U. S. 323, 94 Sup. Ct. 2997, 41 L. Ed. 2d 789, the court re-examined the issue presented in *Rosenbloom* of whether a newspaper or broadcaster that publishes defamatory falsehoods about an individual, who is neither a public official

nor a public figure, may claim a constitutional privilege against liability for the injury inflicted by such statements. The court held that the issue was presented on a rather different set of facts than in *Rosenbloom*. In *Gertz,* after a police officer had been convicted of murder, the attorney who represented the murder victim's family in a civil suit against the officer was discussed in a John Birch Society magazine in a false and defamatory manner. The plaintiff Gertz was identified as a "Leninist," a "Communist-fronter," and a former official in a "Communist organization." In Gertz' libel action against the magazine, the court of appeals for the seventh circuit affirmed the district court's entry of a judgment notwithstanding the verdict against Gertz, applying the *Times* and *Rosenbloom* constitutional privilege standards. On certiorari the United States Supreme Court found these standards inapplicable and reversed. The supreme court did not deny that the matters discussed in the publication about Gertz were of general or public interest, but the court nevertheless ruled that the extension of the *Times* test as "proposed" by the *Rosenbloom* plurality was unacceptable. *Gertz,* at page 346. The court noted that the private individual has less opportunity than a public figure for effective rebuttal of defamatory statements and thus is more vulnerable to injury; the public figure has, to some extent, voluntarily exposed himself to attention, comment and criticism, thereby rendering himself less deserving of recovery than the private person. *Gertz,* pages 344, 345. Moreover, the constitution itself does not require the application of the *Times* test in these circumstances, and therefore the court said at page 347:

"We hold that, so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual."

This was held to be true even though the injury to the private plaintiff arose out of a defamation covering issues of general or public interest.

The matter of punitive damages in *Gertz* is discussed elsewhere in this opinion.

The trial court, in the case before us, instructed the jury that in order to find for the plaintiff it must find that the defendants' conditional privilege was abused and overcome and to do that they must find that Mr. Bagemihl was motivated by express malice. The court also instructed the jury that it must so find only if it is satisfied to a reasonable certainty by the greater weight of the credible evidence.

While the defendants do not explicitly challenge the application of the "express" as opposed to "actual" malice test, they do attempt to challenge the instruction as to the quantum of proof required before malice could be found. Their argument is that instead of applying the minimal greater weight standard the trial court should have applied the middle-level clear and convincing test. As pointed out in the discussion above, this case does not fall within the first amendment protected conditional privilege, but is a nonconstitutionally protected conditional privilege. We hold, therefore, that the middle-level burden is not properly applied in this case; rather, the minimal or greater weight standard is applicable here.

The next question is the proper test applicable to determine if punitive damages are allowable. The defendants rely on *Gertz*, wherein it was held that punitive damages could not be recovered under the less-exacting test, but could be recovered only when the *Times* knowing-or-reckless-falsity test was met by evidence of convincing clarity. But the "constitutional command of the First Amendment" is said to be the "competing interest" requiring this rule. *Gertz,* page 349. The rule is said to apply to "publishers and broadcasters" and to be moti-

vated by a concern that ". . . jury discretion to award punitive damages unnecessarily exacerbates the danger of media self-censorship . . . ." *Gertz,* page 350. This is clearly a first amendment application of the rule. Neither *Times* nor *Gertz* protections apply to the case before us. As Mr. Justice GOLDBERG said, concurring in *Times,* pages 301, 302:

"Purely private defamation has little to do with the political ends of a self-governing society. The imposition of liability for private defamation does not abridge the freedom of public speech or any other freedom protected by the First Amendment."

This court, however, has said that the *Times* rule ". . . is not confined to news media and free press but also applies to private individuals and free speech in some cases." *Dalton v. Meister* (1971), 52 Wis. 2d 173, 183, 188 N. W. 2d 494, certiorari denied, 405 U. S. 934, 92 Sup. Ct. 947, 30 L. Ed. 2d 810. However, the two cases relied upon in support of that statement show that it has no application here. In the first case, *St. Amant v. Thompson* (1968), 390 U. S. 727, 88 Sup. Ct. 1323, 20 L. Ed. 2d 262, the court applied the *Times* test to statements made by a candidate for public office charging a public officer (deputy sheriff Thompson) with criminal conduct. The statements were made in a televised speech. That situation was clearly within the zone of the first amendment considerations and the court emphasized ". . . the stake of the people in public business and the conduct of public officials . . . ." *Thompson,* pages 731, 732. The other case relied on for this court's statement in *Dalton* was *Linn v. Plant Guard Workers* (1966), 383 U. S. 53, 86 Sup. Ct. 657, 15 L. Ed. 2d 582. There, Linn was an officer of an employer sought to be unionized by the defendant union. He sued for libel based on defamatory statements relating to managerial conduct, which statements were made during a labor dispute. The prin-

cipal issue in the case was whether, under the National Labor Relations Act, the courts had jurisdiction to apply state remedies. After resolving that question in favor of jurisdiction, the court found that the *Times* knowing-or-reckless-falsity (by clear and convincing evidence) test applied to the action. But this conclusion was based on a construction of the NLRA, not the constitution. Because the NLRA ". . . manifests a congressional intent to encourage free debate on issues dividing labor and management. . . ." the *Times* test must be applied. But that test is ". . . adopted by analogy, rather than under constitutional compulsion. . . ." and done to effectuate the statutory design. *Linn*, pages 62, 65.

*Thompson* and *Linn* are not in point. In the instant case, we are not dealing with a conditional privilege based on first amendment principles but rather with one based on a public policy favoring the encouragement of a free interchange of information under certain circumstances. The circumstances are the inquiry by a prospective employer of a former employer. In such a case, one must prove only "express malice" which is a defamatory statement motivated by ill will, spite, envy, revenge, or other bad or corrupt motives, *Polzin v. Helmbrecht, supra;* and such express malice must be shown by the preponderance of the evidence. In the case before us there is no matter of general or public interest; there is no public official or public figure; there is no involvement of the media, either broadcast or print. It is thus different than the issues raised involving an alderman running for mayor in the case of *Richards v. Gruen* (1974), 62 Wis. 2d 99, 214 N. W. 2d 309.

To recover punitive damage in this ordinary common-law private libel action, the plaintiff must show express malice by a preponderance of the evidence. The jury was so instructed and so found. The reliance by the defendants on *Polzin v. Helmbrecht, supra,* is misplaced

because it was a case set in the constitutionally protected area discussed above.

The next issue raised by the defendants is, was there sufficient evidence to support the verdict? It is their contention that there was not. The defendants contend that the trial court's denial of their motions challenging the sufficiency of the evidence to support the verdict of the jury was error. It is claimed that there was insufficient credible evidence that Mr. Bagemihl acted with knowledge that the statements he made to Mr. Calero's prospective employers were false or with a reckless disregard of whether they were false or not. We need not get into the question of whether the evidence adduced here would have supported a finding of actual malice under the *Times* test because that is not the test which applies here. The proper test to apply to determine whether the nonconstitutional conditional privilege was abused is a question of express malice. This is what is termed "common law malice," by the United States Supreme Court. *Rosenbloom*, page 37, footnote 9. It exists when the person acts from motives of ill will, envy, spite, revenge, or any other bad or corrupt motives. *Polzin v. Helmbrecht, supra,* page 587. In some cases a good-faith belief in the truth of the statement will be sufficient to establish the privilege, but as this court said in *Jospeh v. Baars* (1910), 142 Wis. 390, 392, 393, 125 N. W. 913, that belief:

". . . must of course be founded upon some information. Mere reckless statements, or statements based on nothing in the way of information, are not protected, because they cannot be said to have been made in good faith; but statements honestly believed to be true, based upon some tangible information and made from an honest desire to promote public justice, and made to the proper officer or one honestly supposed to be the proper officer, are protected, though some more prudent person would not perhaps have believed in the truth of the information on which the statement is based."

From the facts which have been fully stated earlier in this opinion, we find there is sufficient credible evidence of express malice to support the jury verdict.

The proper standard to apply was set out in *Bergmann v. Insurance Company of North America* (1970), 49 Wis. 2d 85, 87, 88, 181 N. W. 2d 348:

". . . if there is any credible evidence which under any reasonable view fairly admits of inferences which support the jury's verdict, the verdict must be sustained, and neither the trial court nor this court may tamper with it. . . . The evidence must be considered in the light most favorable to the jury verdict. . . . Furthermore, the trial judge and this court are only to consider the evidence which supports the jury's verdict. . . . The evidence supporting the verdict must be accepted by the court unless it appears that the evidence is patently incredible."

If there is credible evidence to support the jury verdict, it does not matter that it is contradicted or that the contradictory evidence is stronger and more convincing. *Lutzenberger v. Milwaukee Electric Railway & Light Co.* (1937), 224 Wis. 44, 48, 271 N. W. 409. Furthermore, the above "is particularly true when the verdict has the blessing of the trial court . . . ." *Delaney v. Prudential Ins. Co.* (1966), 29 Wis. 2d 345, 349, 139 N. W. 2d 48.

There is credible evidence that the charges against the plaintiff were untrue and that Mr. Bagemihl relied on only office hearsay without any attempt to verify or investigate the charges. He did not even consider the plaintiff's explanation or contact Mr. Danen with regard to it. Other evidence readily gives rise to very reasonable inferences that Mr. Bagemihl was actuated by express malice as that term is used in the law, and there is ample evidence to support the jury verdict. The trial judge so found and we agree.

The next issue raised is that the damages awarded are alleged to be excessive. The defendants claimed in motions after verdict and here on appeal that the verdict must be set aside and a new trial granted because the damages were excessive due to the bias, prejudice, and speculation of the jury.

In *Bethke v. Duwe* (1950), 256 Wis. 378, 385, 41 N. W. 2d 277, this court said:

> " 'Full compensation is impossible in the abstract, and different individuals will vary in their estimate of the sum which will be a just pecuniary compensation. Hence, all that the court can do is to see that the jury approximates a sane estimate, or, as it is sometimes said, see that the results attained do not shock the judicial conscience. . . .' "

This statement was cited with approval in *Seitz v. Seitz* (1967), 35 Wis. 2d 282, 302, 151 N. W. 2d 86.

This was the test applied by the trial court. The judge stated that he considered the award liberal but not conscience shocking and that he could not substitute his judgment for that of the jury. He said he could not legitimately draw the conclusion that the jury was persuaded by bias, prejudice or sympathy. In *Springen v. Ager Plumbing & Heating, Inc.* (1963), 19 Wis. 2d 487, 489, 120 N. W. 2d 692, this court said it would have been better satisfied if the trial court had found the verdict excessive; and that such a finding would not have been an abuse of discretion. However, this court went on to say that the trial court's opinion must be given great weight; and the verdict was sustained. This court then stated the proper test for determining excessiveness of a verdict as follows:

> "Our review must be based on the rule that when there is any credible evidence which under any reasonable view supports the jury finding, especially when the verdict has the approval of the trial court, it should not be dis-

turbed. This is another way of saying the evidence must be viewed in the light most favorable to the verdict."

There is ample credible evidence to support the jury's award of $10,000 compensatory damages. Of that amount, $3,000 was awarded for injuries to the plaintiff's feelings, general reputation and good name in the community. The law does not require specific proof on these elements of damage. *Lawrence v. Jewell Companies, Inc.* (1972), 53 Wis. 2d 656, 660, 193 N. W. 2d 695. Based on the plaintiff's experience following his dismissal from Del Chemical and his testimony that he felt demoralized and humiliated and felt forced to move to Arizona to find employment, the sum of $3,000 is not excessive. The jury awarded $7,000 for loss of income. The plaintiff was unemployed for a minimum of ten months. When he left Del Chemical he was making about $12,000 a year and he testified that the next year he made $5,600. His tax returns show he did not make $12,000 in any year from 1968 to 1972, when this action was commenced. The record shows that he made hundreds of job applications, listing Del Chemical as a previous employer on each application. These jobs were in the $12,000 range. The trial court found the $7,000 award and the $3,000 award well within the province of the jury to make. We agree.

As to the $9,000 award for punitive damages, the trial court stated that it was "a more troublesome problem." It found the award liberal though not conscience shocking. The trial court sustained the award. We have already discussed in this opinion that express malice with its greater weight of the evidence burden of proof was properly applied in this type of defamation lawsuit. We find that there was sufficient evidence to uphold the jury's award of $9,000 punitive damages. This court has stated that punitive damages ". . . should be proportionate with compensatory damages . . . ." *Wozniak v.*

*Local 1111 of the UE* (1973), 57 Wis. 2d 725, 731, 205 N. W. 2d 369. In the present case the awards were $10,000 compensatory damages with $9,000 punitive damages. This court has also stated: "There is no arbitrary rule that punitive damages cannot equal 15 times the compensatory damages." *Malco v. Midwest Aluminum Sales* (1961), 14 Wis. 2d 57, 66, 109 N. W. 2d 516. This court has also said that it is relevant to consider the maximum fine in the Criminal Code governing similar offenses. *Wozniak,* page 731; *Meke v. Nicol* (1973), 56 Wis. 2d 654, 664, 203 N. W. 2d 129. The maximum fine for defamation under sec. 942.01, Stats., is $1,000. The award here is nine times that. In *Meke* this court considered an award of punitive damages 13 times the maximum fine for a similar offense as but *one element* in its decision to set aside the verdict. But in *Dalton v. Meister, supra,* page 181, this court upheld an award of $75,000 in punitive damages in a libel case where the maximum fine was as it is here, $1,000, stating ". . . this court has set no arbitrary maximum" on punitive damage awards.

In *Lisowski v. Chenenoff* (1968), 37 Wis. 2d 610, 634, 155 N. W. 2d 619, we said:

". . . the circumstances of each case must be considered on their own and a verdict in one case cannot be appropriately compared with a verdict in another except in a very general way . . . ."

The purpose of punitive damages is to punish the wrongdoer for his malice and to deter others from like conduct. *Malco v. Midwest Aluminum Sales, supra,* page 66. There is evidence in this case from which the jury could reasonably find sufficient malice on the part of defendants to award the $9,000 in punitive damages. These damages were approved by the trial court. As this court said in *Kink v. Combs* (1965), 28 Wis. 2d 65, 78, 135 N. W. 2d 789:

"The trial court having heard all the evidence and seen the witnesses is peculiarly able to make a proper determination [as to excessiveness of damages]. It is not within our power as an appellate court to set aside a verdict as excessive unless it is so clearly excessive as to indicate that it was the result of passion, prejudice, or corruption, or it is clear that the jury disregarded the evidence or rules of law."

Applying the *Kink* principles to the record in this case, the trial court's ruling on motions after verdict on the issues of both compensatory and punitive damages is sustained.

*By the Court.*—Judgment and order affirmed.