Dennis D. ANDERSON, et al., Respondents,

v.

Gayton R. KAMMEIER, Appellant,

and

G. R. K., INC., and Employment Counselors, Inc., Appellants,

v.

Dennis D. ANDERSON, et al., Respondents.

No. 47205.

Supreme Court of Minnesota.

Nov. 18, 1977.

Rehearing Denied Jan. 9, 1978.

---

Monte M. Miller, Minneapolis, Craig D. Larson, Champlin, for appellants.

Simonson & Bartsh and Thomas C. Bartsh, Minneapolis, for respondents.

Heard before KELLY, YETKA, and SCOTT, JJ., and considered and decided by the court en banc.

YETKA, Justice.

An appeal following a bench trial in Hennepin County District Court in which the respondents were allowed to rescind a management consultant contract and awarded $1,000 in punitive damages for slander. We affirm.

This appeal raises these issues:

(1) Whether the actions of the appellant constituted a material breach of the agreement between the parties.

(2) Whether the agreement entered into between the parties was divisible or entire.

(3) Whether the statements that a businessman was a "draft dodger," that he "should not be trusted," and that he would "stab anyone in the back" are slander per se.

This case involves the sale of an employment business to several employees. Appellant Gayton R. Kammeier owned Employment Counselors, Inc. (ECI) and managed its Bloomington office. Respondent Dennis D. Anderson worked for ECI and managed its Minneapolis office. In October of 1969, Anderson told Kammeier he wanted to leave ECI and start his own agency. During the negotiations Kammeier met with two other employees of the Minneapolis office (Richard Thompson and Richard Rost) who were considering leaving ECI and joining Anderson. During the course of their conversation, Kammeier referred to Anderson and asked if they could "put their faith in a draft dodger." Subsequently, both employees joined Anderson.

On October 28, 1969, Kammeier executed an agreement [1] with Anderson and Thompson. For a consideration of $40,000 Kammeier agreed to transfer the Minneapolis office to Anderson and Thompson. Kammeier agreed to transfer the remainder of the lease on the Minneapolis office, the office furniture and equipment, and all the standing job orders and completed applicant forms. In addition, he agreed to release the parties from their employment contracts (which contained restrictive covenants), and to advise the parties in the running of the business. After the execution of the agreement, the parties decided to allocate the majority of the $40,000 to the management consultation agreement to receive more favorable tax treatment. Accordingly, the parties executed a second agreement on December 1, 1969, in three parts, a bill of sale for the lease and equipment ($5,000), a release of the employment contracts ($5,002), and a management consulting agreement ($32,500). The consideration for the consulting agreement was to be paid in monthly installments of $1,250 starting on March 15, 1970; in return, Kammeier agreed to furnish the following services upon specific request:

"a. Provide advice and consultation regarding hiring and training employees, preparation and placement of advertising, obtaining job orders, purchasing, supervising employees, accounting, bookkeeping, and other services for the proper operating practices of Graduate.

"b. Provide advice and consultation with collection procedures and problems (excluding legal services)."

Anderson and Thompson would do business as Graduate Personnel, Inc. Kammeier also sold his interest in a second employment agency in which Anderson had been involved, D.S.I., for $400, one tape recorder, and 40 percent of the profits. A tape disclosing illegal recruiting activities by a D.S.I. employee was inadvertently included.

During the next 3 months, Kammeier was called upon to give advice on three

occasions, twice for legal matters, the necessity of licensure for the affiliated D.S.I. and the application of the minimum wage law to employment counselors, and once with respect to the bonding necessary to operate the employment agency. Twice the advice was erroneous.

On March 16, 1970, one day after the first installment was due on the consultation agreement, Kammeier received a letter from Anderson and Thompson purporting to terminate the consultation agreement with G.R.K. The letter alleged that employees of Kammeier's had been "circulating certain false and slanderous information about Graduate Personnel, Inc. and its employees," and had "intentionally engaged in conduct designed to impair the potential or existing business relationships of Graduate Personnel, Inc." In response, Kammeier reiterated his willingness to perform the contract. No payments were ever made.

Shortly thereafter, the Minnesota Department of Labor and Industry, responding to a complaint from 3M, contacted Kammeier about an investigation of the affiliated firm (D.S.I.) he had sold to Anderson. Without informing Graduate, Kammeier disclosed the contents of the tape to the state. At the time, Graduate was attempting to sell D.S.I. to an employee. Kammeier advised the employee to be cautious in purchasing D.S.I. from Anderson because he would "stab anyone in the back if given the chance," and further that Anderson still owed him money from the sale of the Minneapolis office. The state refused D.S.I.'s application for a license.

In November of 1970, Kammeier advised personnel representatives of Fingerhut Corporation that Anderson and Thompson were "a couple of highbinders," and that the reputation of Anderson's wife "left much to be desired." Fingerhut continued to do business with Anderson and Thompson.

Thereafter, the present action was instituted. Kammeier sought the payment of the $32,500 remaining on the purchase price. Anderson and Thompson claimed a

---

1. The agreements were made on behalf of Employment Counselors, Inc., and G.R.K., Inc., both of which were owned by Kammeier and for which Kammeier served as president.

failure of consideration and rescission, and requested damages for slander.

The trial court held that Graduate was justified in its March 16, 1970 rescission of the contract. With respect to the claim for slander, the court found that statements were slanderous per se and awarded $1,000 in punitive damages, even though Graduate did not lose any clients or suffer any monetary damage.

### Contract Claim

On appeal, the appellants contend the trial court erred in allowing the rescission of the management consultation agreement on two grounds, first, that the breach, if any, was not material, second, that the consultation agreement was not severable from the other agreements.

■ With respect to the alleged breach, the trial court held that the advice which Kammeier gave, the alleged slanderous remarks by Kammeier, and the turning over of the tape to the state of Minnesota constituted grounds for rescission because—

"* * * after the bad advice that had been given, the slanderous remarks by Kammeier, and the method used to get the contents of the DSI tape to the State, Graduate could not go with feelings of reasonable safety to confide its

problems to G.R.K. and expect to rely upon its advices. The Management Consultant Agreement was gone at that point as a practical matter and Anderson, Thompson and Graduate were justified in declaring it rescinded."

Given the personal nature of the services expected and the degree of confidence necessary to assure the proper completion of them, the trial court was correct in concluding that the actions of Kammeier constituted a material breach of the agreement.

Because the breach was a material one, the issue then becomes whether merely the management consultation agreement or the entire transaction should have been rescinded, that is, whether the management contract was severable from the lease of office space and release of the employment contracts. The appellants argue the three agreements constituted a single transaction and thus the rescission must be of all three agreements. The respondents, on the other hand, contend the three agreements are divisible.

■ Whether a contract is entire or divisible depends on the intent of the parties; it must be determined by considering the language used, the subject matter of the contract, and how the parties themselves treated it.[2] E. g., *McGrath v. Can-*

---

**2.** In ascertaining the intent of the parties, there is no impediment to construing the three agreements together. Contracts in several writings relating to the same transaction will be construed with reference to each other. E. g., *Anchor Casualty Co. v. Bird Island Produce, Inc.,* 249 Minn. 137, 82 N.W.2d 48 (1957); 17 Am.Jur.2d, Contracts, § 264; 17A C.J.S. Contracts, § 298; 4 Dunnell, Dig. (3 ed.) § 1831. Moreover, parol evidence is admissible to explain the circumstances surrounding the execution of the documents. While earlier decisions took a restrictive view of the admission of parol evidence for purposes of interpretation, the more recent decisions hold that questions of interpretation are not significantly affected by whether an agreement is integrated. See, *Pacific Gas & Elec. Co. v. G. W. Thomas Drayage & Rigging Co.,* 69 Cal.2d 33, 69 Cal.Rptr. 561, 442 P.2d 641 (1968); *Garden State Plaza Corp. v. S. S. Kresge Co.,* 78 N.J.Super. 485, 189 A.2d 448 (1963). See, generally, Farnsworth, "Meaning" in the Law of Contracts, 76 Yale L.J. 939 (1967). This is also the position of the Restatement. See, Restatement, Con-

tracts 2d Tent. Draft No. 5, §§ 238(1), 240(c). See, also, Minn.St. 366.2–202. Thus, as stated in comment *b* of Restatement, Contracts 2d Tent. Draft No. 5, § 238:

"It is sometimes said that extrinsic evidence cannot change the plain meaning of a writing, but meaning can almost never be plain except in a context. Accordingly, [§ 238(1)] is not limited to cases where it is determined that the language used is ambiguous. Any determination of meaning or ambiguity should only be made in the light of the relevant evidence of the situation and relations of the parties, the subject matter of the transaction, preliminary negotiations and statements made therein, usages of trade, and the course of dealing between the parties. * * *"

Thus, under this view, a court need not make a preliminary determination that the language is ambiguous to permit parol evidence for the purpose of interpreting an integration. In the present case, therefore, it is proper to construe the three agreements together and to admit extrinsic evidence to explain the meaning of the agreements.

*non*, 55 Minn. 457, 57 N.W. 150 (1893). See, generally, 3A Corbin, Contracts, §§ 687 to 699; 6 Williston, Contracts, §§ 860 to 870; 17 Am.Jur.2d, Contracts, §§ 324 to 328; 4 Dunnell, Dig. (3 ed.) § 1727, Williston defines a divisible contract in these terms:

"A contract under which the whole performance is divided into two sets of partial performances, each part of each set being the agreed exchange for a corresponding part of the set of performances to be rendered by the other promisor, is called a divisible contract. Or, as expressed in the cases:

'A contract is divisible where by its terms, 1, performance of each party is divided into two or more parts, and, 2, the number of parts due from each party is the same, and, 3, the performance of each part by one party is the agreed exchange for a corresponding part by the other party.'

"Or, stated in another way: 'The distinguishing mark of a divisible contract is that it admits of apportionment of the consideration on either side so as to correspond to the unascertained consideration on the other side. Where such a purpose appears in the contract, or is clearly deducible therefrom, it is allowed great significance in ascertaining the intention of the parties. * * * ' " 6 Williston, Contracts, § 860.

■ Judged against this standard, the agreements are divisible. Each of the agreements was of a different type and each allocated a specific consideration to its performance. The amount of consideration allotted to each agreement was bargained for by the parties. The performance of each party specifically was divided into several parts and the consideration was apportioned accordingly. Thus, the trial court correctly allowed the respondents to rescind the management consultant agreement.

■ The argument of appellant that the form of the contract separating the consulting agreement from the personal property transferred and the employment contract release was to avoid the payment of income taxes is not valid. One who deliberately drafts instruments in a form other than that of the intent of the parties to avoid otherwise valid income taxes should not be permitted to benefit from such an attempt by later arguing that the contract for services merely disguises what should have been a higher payment for either the value of the business or for the release of the noncompetition clauses, or both.

*Slander*

The trial court found that there were three incidents of slander per se. These were that Anderson was a "draft dodger;" that he "should not be trusted;" and that he would "stab anyone in the back." No actual damages were proven; however, the court awarded $1,000 in punitive damages. On appeal, the appellants contend the use of these terms was not slander per se.

■ The term "draft dodger" is not, taken alone, defamatory because the term is ambiguous. On the one hand, it might be used to describe a person who had violated the selective service laws. This would be an accusation of a crime and, if false, would constitute slander per se. See, Prosser, Torts (4 ed.) § 112, pp. 754 to 756. On the other hand, the same statement might merely refer to a person who took advantage of legitimate deferments to service, such as a 2–S student deferment.

■ When the defamatory meaning arises only from facts not apparent upon the face of the publication, the plaintiff has the burden of pleading and proving such facts, or the inducement. E. g., *Ten Broeck v. Journal Printing Co.*, 166 Minn. 173, 207 N.W. 497 (1926). Likewise, he must establish the defamatory sense of the publication with reference to such facts, or the innuendo. See, *Sharpe v. Larson*, 70 Minn. 209, 72 N.W. 961 (1897). In the present case, the evidence introduced on the matter was the following:

"Q [Respondents' attorney] What did the term 'draft dodger' mean to you?

"A [by Richard Thompson] Well, I had just spent four years, three months and nine days in the United States Air

Force as a captain, lost many friends in Southeast Asia, and to make a statement like that about somebody that I was going into business with, I didn't believe that Denny was a draft dodger. But it certainly sounded to me, or it meant to me that he was pulling up every piece of mud that he could get his hands on to make me not want to associate myself with Dennis and Graduate Personnel."

The determination of whether this communication was defamatory was a question of fact for the court, which applied the test as to whether a reasonable person would believe the statement to be defamatory. We cannot say that the court's decision was clearly erroneous.

■ The respondents contend that the other terms also constitute slander per se because they affect Anderson's business, trade, or profession. Along with charges of a crime, imputations of a loathsome disease, and unchastity, imputations affecting a person's conduct of business, trade, or profession are actionable without proof of special damage. The words, however, must be peculiarly harmful to the person in his business. General disparagement is insufficient. It must depend on the occupation and the particular statement. In other words, the remarks must relate to the person in his professional capacity and not merely as an individual without regard to his profession.[3] E. g., *High v. Supreme Lodge*, 214 Minn. 164, 7 N.W.2d 675 (1943); Prosser, Torts (4 ed.) § 112, pp. 758 and 759; Restatement, Torts, § 573, comment *e.*

■ The statements that Anderson "should not be trusted" and would "stab anyone in the back" clearly come within these standards. The terms contest the honesty of Anderson in the operation of his business affairs and thus are slander per se. Under the proper circumstances these remarks might have been privileged;[4] however, such issues were not raised in the pleadings or the trial court.[5]

■ The trial court found that the respondents did not suffer any pecuniary loss as a result of the slanderous remarks, yet awarded $1,000 as punitive damages. When words are defamatory per se, however, punitive damages are recoverable without proof of actual damages. *Loftsgaarden v. Reiling*, 267 Minn. 181, 126 N.W.2d 154 (1964), certiorari denied, 379 U.S. 845, 85 S.Ct. 31, 13 L.Ed.2d 50 (1965).

The trial court is affirmed.

OTIS, J., took no part in the consideration or decision of this case.

---

**3.** Compare, e. g., *Gribble v. Pioneer Press Co.*, 34 Minn. 342, 25 N.W. 710 (1885) (actionable per se to charge a lawyer with being a "shyster") with, e. g., *McDermott v. Union Credit Co.*, 76 Minn. 84, 78 N.W. 967 (1899) (not actionable per se to charge attorney with being habitually "slow" in the payment of his personal debts). In the one case the remarks affect the person's professional capacity; in the other they do not.

**4.** Certain qualified privileges might have been available to the appellant here, such as "interest of others," (see, Prosser, Torts (4 ed.) § 115, p. 787) or "common interest" (Id., p. 789); however, they were not put into issue. Neither was truth or consent, which would be absolute defenses.

**5.** Since the parties did not raise the issue here, we do not consider the possible application of any of the principles of *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), to this case. In *Gertz*, the United States Supreme Court held, inter alia, that presumed damages are no longer recoverable, and that punitive damages are not recoverable in a defamation action in the absence of a showing that the statement was made with knowledge of its falsity or with reckless disregard of its truth or falsity. Although the *Gertz* decision itself involved a newspaper, some states have applied these rules to all defamation cases [see, e. g., *Jacron Sales Co., Inc. v. Sindorf*, 276 Md. 580, 350 A.2d 688 (1976)], while others have limited the new rules to cases involving media-defendants [see, e. g., *Calero v. Del Chemical Corp.*, 68 Wis.2d 487, 228 N.W.2d 737 (1975)]. See, also, Restatement, Torts (2d) §§ 558 to 623. Thus, *Gertz* could possibly affect the common law of private defamation in several areas, including pleading, privileges, and damages. Since the consequences of the choice are far reaching, however, the decision is best left to another case in which the issues might be developed more fully. For recent general background information, see, Ashdown, Gertz and Firestone: *A Study in Constitutional Policy Making*, 61 Minn.L.Rev. 645.

WAHL, J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.

TODD, Justice (dissenting).

I respectfully dissent from that portion of the majority opinion which affirms the trial court's allowance of the rescission of the so-called "consultation agreement." Certain facts must be considered in addition to those set forth in the majority opinion. At the December 1 reexecution of the purchase agreements, Anderson and Thompson executed the following guarantee of the consultation agreement:

"In order to induce G.R.K., Inc. to enter into the Management Consulting Agreement with Graduate Personnel, Inc., and in further consideration of the credit extended by G.R.K., Inc. to Graduate Personnel, Inc., the undersigned each personally guarantees the prompt payment and full and complete performance of the obligations of Graduate Personnel, Inc. according to the Management Consulting Agreement dated December 1, 1969.

"This Personal Guarantee is continuing whether or not each of the undersigned continues as an officer, director, stockholder or employee of Graduate Personnel, Inc.

"This Personal Guarantee is direct to G.R.K., Inc. and is not conditional or contingent upon any event.

"None of the undersigned shall be released from this Personal Guarantee until the total amount of $32,500.00 has been paid in full.

"The undersigned hereby sign this Personal Guarantee on December 1, 1969 and bind their heirs and personal representatives to this obligation.

"/s/ DENNIS D. ANDERSON
"/s/ RICHARD P. THOMPSON"

The guarantee was to continue whether the guarantors remained with Graduate Personnel, Inc., or whether the company continued in business. Such a guarantee is totally inconsistent with the concept that the consulting services were what Graduate Personnel needed or wanted. Thus, it is immaterial whether the revised agreement provided tax advantages to G.R.K., Inc.

The trial court expressly found that the documents executed on December 1, 1969, "were all integral parts of one transaction," but nevertheless held that the management consulting agreement is severable from the transaction and that defendant's breach justifies rescission of the management consulting agreement. As will appear below, this conclusion allows the tax form of the transaction to control the contractual substance, and in so doing, produces a result which is both inequitable and at odds with the parties' evident conception of the transaction.

A superficial perusal of the case law produces both authority for treating the December 1 documents as an entire contract and authority for divisible treatment. There is admittedly ample support for the majority's proposition that "[t]he distinguishing mark of a divisible contract is that it admits of apportionment of the consideration * * *." At the opposite extreme are numerous decisions reiterating the familiar rule that "Instruments executed at the same time, for the same purpose, and in the course of the same transaction, are, in the eye of the law, one instrument, and will be read and construed together, unless the parties stipulate otherwise." [1]

In view of the incredible array of results courts have reached on the issue of contract divisibility, an observation made by Professor Corbin seems particularly astute (3A Corbin, Contracts, § 694, p. 281):

"Where [a] court in its opinion appears to use these terms [i. e., 'entirety' or 'divisibility'] as a basis of decision, it is in truth deciding on the basis of those factors that it believes to constitute 'entirety' or 'divisibility' for the purpose in hand. The terms are in fact no more than attempts to describe a result already reached."

The appropriate inquiry under a divisibility issue should therefore focus on the facts and circumstances of a particular transac-

1. 4 Dunnell, Dig. (3 ed.) § 1831, and cases cited thereunder.

tion rather than relying on any mechanistic evaluation of the form of the documentation. A factual examination of this sort should reveal the true nature of a transaction as the parties conceived it, and any judgment on the divisibility issue should be consonant with the character so revealed.

In this case, it could scarcely be more obvious that the transaction which in fact occurred was the sale of a going business concern. No single one of the December 1 instruments would have been executed in the absence of the others.[2] 3A Corbin, Contracts, § 694, pp. 281 to 283. Anderson and Thompson were plainly not interested in obtaining only a lease, or office equipment, or consulting services. It was the business entity which they sought. As such, it is apparent that more than mere consulting services were received by plaintiffs in return for the $32,500 paid under the management consulting agreement.[3] The going concern value or goodwill of ECI also changed hands under the guise of the consulting agreement.

Under these circumstances, it is unjust to sever the consulting agreement from the overall contract of sale and allow it to be rescinded by plaintiffs. Even though the district court judgment directs plaintiffs to return certain of defendant's personal property used by the former under the consulting agreement, it is not possible to order the return of the ECI goodwill which passed to plaintiffs under the December 1 instruments. Thus, in spite of the loss of employer lists and information file under the district court order, plaintiffs will retain much of that business advantage gained solely by virtue of being the successor to the ECI operation. And since plaintiffs are not obligated to make further payments under the rescinded consulting contract, the retention of such business advantage constitutes a substantial windfall gain.

A result more in keeping with the true substance of the transaction would be had by treating the December 1 documents as an indivisible whole. Under this theory, defendant's failure to perform adequately under the consulting arrangement would constitute but a minor breach of the overall contract of sale. Under the rule that a nonmaterial breach of contract neither justifies rescission nor excuses counter-performance, defendant should be answerable in damages only for his breach. See, e. g., 5 Corbin, Contracts, § 1104; 12 Williston, Contracts (3 ed.) § 1467.

Accordingly, I would remand the matter with instructions to enter judgment for plaintiffs in the amount of $32,500, less any amount of damages defendant could establish were proximately caused by the improper advice and less the amount allowed for punitive damages.

---

2. Indeed, it would have been quite impossible for Thompson and the other employees to operate the business without first having procured the releases from ECI.

3. That the parties did not place great emphasis on the consulting services to be provided under the agreement is indicated by the terms of the agreement itself. According to the contract, defendant was under no affirmative obligation to monitor or counsel with respect to plaintiffs' daily operations. That is, defendant was required only to render advice upon plaintiffs' "specific request." In light of the $32,500 consideration paid by plaintiffs, such "consultation" constituted a truly minimal obligation for defendant.