**COURT OF APPEALS**
**DECISION**
**DATED AND FILED**

**April 16, 2020**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2019AP655**

Cir. Ct. No. 2014CV173

**STATE OF WISCONSIN**

**IN COURT OF APPEALS**
**DISTRICT IV**

GLOBAL PROPPANT SUPPLY, LLC,

    PLAINTIFF-APPELLANT,

  V.

SHADOWLAND HOLDINGS, LLC, DAVID M. TUTTLE
AND SALLY A. TUTTLE 1999 REVOCABLE TRUST,
PATRICIA J. SAMPSON, MICHAEL R. ROSIER,
TERRY L. WESTERGARD, SUSAN A. EVANS, NOEL JONES,
DONNA JONES, EARL M. JOHNSON, PATRICIA A. JOHNSON,
MICHAEL KELLY AND NANCY KELLY,

    DEFENDANTS,

DALE W. STICKNEY, SUE A. STICKNEY, VICKI L. CHASE,
HENRY STROHMEYER AND ALICE STROHMEYER,

    DEFENDANTS-RESPONDENTS.

APPEAL from a judgment of the circuit court for Juneau County: TODD J. HEPLER, Judge. *Affirmed in part and reversed in part.*

Before Blanchard, Graham, and Nashold, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. This is a second appeal in this case. *See **Global Proppant Supply, LLC v. Tuttle***, No. 2017AP1137, unpublished slip op. (WI App March 22, 2018) ("***Global I***").[1] As explained in detail in ***Global I***, this is a long-running dispute involving conflicting claims to rights in Juneau County land. *See **Global I***, No. 2017AP1137, ¶¶5-11. The land was at one time intended to be used as a frac sand mine, but those plans have been abandoned, at least at all times pertinent to issues addressed in ***Global I*** and this appeal. *See **id.*** Lender Global Proppant Supply brought this foreclosure action against property owner Shadowland Holdings and named four sets of persons who had sold parcels to Shadowland Holdings for the mining operation. *See **id.*** Global had provided loans, which were secured by the parcels, financing the purchases of the land by Shadowland. ***Id.*** Shadowland defaulted on the Global loans, resulting in this action by Global to foreclose on parcels that the sellers had sold to Shadowland. ***Id.***

¶2 From this point forward, we assume the reader's complete familiarity with ***Global I***, including its four specific conclusions, one of which is central to the

---

[1] The circuit court decisions under review in ***Global Proppant Supply, LLC v. Tuttle***, No. 2017AP1137, unpublished slip op. (WI App March 22, 2018) (***Global I***) were those of the Honorable John P. Roemer. The decisions under review in this appeal were those of the Honorable Todd J. Hepler. In this opinion we identify the judges by name to help distinguish between the two sets of proceedings.

first issue we address. *See id.*, ¶¶4, 64. We fill in additional background as necessary to explain issues pertinent to this appeal. Global is the appellant in this appeal and the respondents are the parties we referred to in *Global I* as the Stickney Group and the Strohmeyer Group. *See id.*, ¶6. In this opinion we refer to the Stickney Group and the Strohmeyer Group collectively as "the sellers."[2]

¶3 The first issue in this appeal involves the law of the case doctrine. Global argues that Judge Hepler, following remand, erred in failing to apply that doctrine to preclude the sellers from revisiting an issue that we resolved in *Global I*. That issue is whether the sellers' options to repurchase the property, as established in the Repurchase Agreements (as written and not as they were reformed by Judge Roemer), had ripened—in other words, had the ability of the sellers to exercise these repurchase options ripened. *See id.*, ¶53. We agree with Global that the sellers cannot relitigate in any court this execution-of-the-options issue based on the contents of the record as it existed at the time of *Global I*. As a result, we agree with Global that Shadowland could not use quitclaim deeds to transfer its property interests to the sellers shortly after Judge Roemer issued the rulings challenged in *Global I*. Use of the quitclaim deeds was impermissible because it was an attempt to exercise the sellers' rights under the Repurchase Agreements as they had been reformed by Judge Roemer, and we determined in *Global I* that the reformation was error. Accordingly, we reverse this aspect of the judgment entered by Judge Hepler.

¶4 The second issue involves the concept of the "waste" of property held as security. Global argues that it would violate an order of Judge Roemer, entered

---

[2] This usage diverges from shorthand used in *Global I*, in which "the sellers" was defined to be a larger group, reflecting that *Global I* addressed a larger set of interests. *See Global I*, No. 2017AP1137, ¶6. No rights of the Tuttle Group or of the Rosier Group are in dispute in this appeal.

prior to *Global I*, prohibiting "[a]ll parties and all persons claiming under them" "from committing waste upon the Mortgaged Property" for Shadowland to transfer the parcels to the sellers. Judge Hepler rejected this argument and we affirm on this issue.

*Law Of The Case*

¶5      Under the long-established law of the case doctrine, "a decision on a legal issue by an appellate court establishes the law of the case, which must be followed in all subsequent proceedings in the trial court or on later appeal." ***Univest Corp. v. General Split Corp.***, 148 Wis. 2d 29, 38, 435 N.W.2d 234 (1989) (citing ***State v. Brady***, 130 Wis. 2d 443, 448, 388 N.W.2d 151 (1986), which in turn quotes ***White v. Murtha***, 377 F.2d 428, 431-32 (5th Cir. 1967));[3] *see also* ***Cathey v. Industrial Comm'n***, 25 Wis. 2d 184, 187-88, 130 N.W.2d 777 (1964) ("This court has said on numerous occasions that a former decision of the supreme court in a cause is conclusive upon the parties and will not be reviewed on a subsequent appeal from other orders made by the circuit court in the same cause.") (citing ***Plesko v. Milwaukee***, 19 Wis. 2d 210, 120 N.W.2d 130 (1963)); ***Hill v. Hoover***, 9 Wis. 12, 15 (1859) (an issue "must be considered as determined by the former adjudication,

---

[3] In ***State v. Brady***, 130 Wis. 2d 443, 448, 388 N.W.2d 151 (1986), our supreme court quoted the following somewhat more comprehensive summary of the doctrine from ***White v. Murtha***, 377 F.2d 428, 431-32 (5th Cir. 1967)):

> [A] decision of a legal issue or issues by an appellate court establishes the "law of the case" and must be followed in all subsequent proceedings in the same case in the trial court or on a later appeal in the appellate court, unless the evidence on a subsequent trial was substantially different, [or] controlling authority has since made a contrary decision of the law applicable to such issues.

and that the order of the circuit court [to the contrary] should be reversed, and the former order … restored.").

¶6 The doctrine reaches broadly. Litigants are bound by the mandate of the appellate court "as to all matters actually presented *or which might consistently with legal rules have been presented* to this court upon appeal." *Monahan v. Fairbanks-Morse Mfg. Co.*, 150 Wis. 512, 516, 137 N.W. 748 (1912) (emphasis added); *see also Lutien v. City of Kewaunee*, 151 Wis. 607, 609, 139 N.W. 312 (1913) (doctrine forecloses subsequent litigation whether "questions of law" resolved in the initial opinion were "thought of by counsel and argued or not"). The doctrine is dictated by the "public interest" in avoiding the occurrence of lawsuits "strung along by successive appeals for years." *Monahan*, 150 Wis. at 515; *see also State v. Stuart*, 2003 WI 73, ¶23, 262 Wis. 2d 620, 664 N.W.2d 82 (need to avoid "'intolerable instability for the parties'" (quoted source omitted)).

¶7 We review independently, as an issue of law, whether the law of the case established by an appellate court decision forecloses argument on a particular, allegedly settled, issue. *See Stuart*, 262 Wis. 2d 620, ¶20.

¶8 To repeat, the issue that Global argues could not be revisited following remand involves the sellers' execution of their options to repurchase the respective parcels that they had sold to Shadowland. *See Global I*, No. 2017AP1137, ¶¶51-53. More specifically, we addressed the terms of the sellers' Repurchase Agreements, which required Shadowland to give notice to the sellers that Shadowland was terminating all mining activity on the property, which was a notice required for the ripening of the repurchase rights of the sellers. *Id.*

¶9 In addressing this execution-of-the-options issue in *Global I*, we determined that the options under the Repurchase Agreements "have not ripened,

meaning that no triggering event has yet occurred that would allow [the sellers] to exercise their repurchase options." *Id.*, ¶51. We explained that we resolved this issue based on the failure of the sellers to respond to Global's argument that "there is no evidence that Shadowland Holdings provided the required notice." *Id.*, ¶¶51-53.

¶10 The following is additional background pertinent to the law of the case issue, not referred to in *Global I*.

¶11 The rulings of Judge Roemer that were appealed in *Global I* were entered on May 18, 2017, and Global filed a notice of appeal on June 6, 2017. Included in the record on appeal in *Global I* is an affidavit of Global's counsel, filed with Judge Roemer on July 10, 2017, seeking an emergency stay pending appeal. Attached to the affidavit is correspondence and other documentation reflecting that, on June 29, 2017, counsel for Shadowland notified Global and the sellers that: (1) the sellers had submitted to Shadowland on May 25, 2017, notices that they were exercising their repurchase options; and (2) Shadowland intended to execute deeds conveying to the sellers titles to the option property. Counsel for Global averred that counsel for the sellers had informed her that the sellers would not agree to a request by Global to agree to hold off on the intended repurchases pending disposition of the *Global I* appeal, and that the sellers intended to proceed with the transfer as soon as possible.

¶12 A separate affidavit of counsel for Global, filed with Judge Hepler following remand, attaches documents reflecting that Shadowland executed quitclaim deeds to the sellers to transfer their respective parcels and that the deeds were recorded on July 17, 2017.

6

¶13 The sellers filed their appellate brief in *Global I* on September 28, 2017, more than two months after these quitclaim deeds were recorded. The seller's brief made no reference to the sellers exercising their repurchase rights based on the quitclaim deeds.

¶14 As to Global's emergency stay motion, the sellers objected based on the existence of a lis pendens that had been recorded with the Juneau County Register of Deeds, providing public notice that this action relates to the property at issue. The sellers argued that no stay was necessary because the lis pendens would adequately protect Global's rights pending the outcome of *Global I*. The circuit court (per the Hon. James Evenson, who temporarily presided) denied Global's stay motion on July 14, 2017, citing the existence of the lis pendens, which the court stated provided adequate protection of Global's interests because it stood as a "notice that the real estate is conclusively bound by the result of the litigation."

¶15 Following remand, Global moved Judge Hepler for an order "rescinding" the quitclaim deeds. Global explained that, because this court had determined in *Global I* that the sellers' repurchase options "have not ripened," therefore Shadowland's transfers to the sellers, which had been made pursuant to Judge Roemer's partially reversed original order reforming the Repurchase Agreements, "must be rescinded so that [Global] may complete a foreclosure sale of the mortgaged property." That is, Global contended that Shadowland had provided the quitclaim deeds to the sellers pursuant to the erroneously reformed Repurchase Agreements, and pointed out that the sellers' appellate brief to this court in *Global I* "never mentioned" a supposed sellers-Shadowland agreement causing the options to ripen under the Repurchase Agreements *as written* (not reformed).

7

¶16    The sellers subsequently moved Judge Hepler for an order "affirming" the quitclaim deeds, based on the premise that the sellers had validly exercised their repurchase options back in May 2017, shortly after Judge Roemer had entered his rulings that were the subject of the *Global I* appeal. The sellers contended that they and Shadowland had agreed to "streamline" the steps to consummate a transfer from those set forth in the Repurchase Agreements as written, and had mutually agreed to waive "the formalities of written notice and proceed[] directly to closing." The sellers further contended that *Global I* had nothing pertinent to say on this issue, because in *Global I* this court was limited to reviewing only aspects of the record that reflected events that had occurred prior to the original May 18, 2017 rulings of Judge Roemer. Under this view, the sellers were properly presenting Judge Hepler, post-remand, with a new argument based on events post-dating Judge Roemer's rulings.

¶17    Judge Hepler agreed with the sellers, entering judgment "affirming" the sellers' deeds from Shadowland "conveying title unencumbered by" Global's mortgage lien and denying Global's motion to rescind the deeds and to permit a sheriff's sale of the property.

¶18    In this appeal, the parties renew their arguments about the significance of our conclusion in *Global I* that "these options have not ripened" under the Repurchase Agreements as written, based on the sellers' implicit concession to an argument explicitly made by Global. *See Global I*, No. 2017AP1137, ¶53. We agree with Global that, after Global raised the execution-of-the-options issue in *Global I*, and after we resolved that issue, the sellers may not ignore our determination. And, they cannot get around the binding nature of our prior decision on this issue by attempting to now recharacterize the execution of the options as a

"streamlined" agreement that was struck outside the parameters of the Repurchase Agreements.

¶19     As Global now argues, in the *Global I* appeal, Global placed squarely before this court the following question: Had the sellers' options ripened under the Repurchase Agreements as written, allowing the sellers to execute the options, in light of the fact that Shadowland had not provided the sellers with the required written notice? For whatever reason, the sellers provided no argument on this execution-of-the-options issue.[4] *Id.*, ¶53. In light of that silence, we applied the general rule to address silence by a party on a pertinent issue raised by the other side, unambiguously resolving the issue based on a concession. *Id.*; *see Charolais Breeding Ranches, Ltd. v. FPC Sec. Corp.*, 90 Wis. 2d 97, 109, 279 N.W.2d 493 (Ct. App. 1979) ("'Respondents on appeal cannot complain if propositions of appellants are taken as confessed which they do not undertake to refute.'" (quoted source omitted.)).

¶20     The sellers now impermissibly seek to relitigate the execution-of-the-options issue, based on events and documents that they could have discussed, but did not, in *Global I*. They argue that their options ripened under the Repurchase Agreements as the parties agreed to adjust them, because shortly after Judge Roemer entered his order reforming the Repurchase Agreement, they agreed with Shadowland to waive the requirements otherwise needed to ripen their options under

---

[4] Global suggests that the sellers intentionally reserved argument on the execution-of-the-options issue to create the potential for "another bite at the apple if [*Global I*] did not go their way," but we need not decide whether this occurred. Under the case law we have cited, it does not matter whether the omission was a litigation tactic, an oversight, or made for some other reason. The law of the case doctrine creates incentives for litigants to avoid omitting arguments they could make on appeal—whether by intentional or inadvertent omission—because the contrary rule would create "intolerable instability for the parties" and for others who may be affected by the parties once again relitigating a settled issue. *See State v. Stuart*, 2003 WI 73, ¶23, 262 Wis. 2d 620, 664 N.W.2d 82.

the Repurchase Agreements as written. However, based on documents that were properly available to this court at the time of **Global I**, the sellers "might" have presented us with this precise argument. *See **Monahan***, 150 Wis. at 516.

¶21 The sellers make a series of assertions that appear to be off point or at least not clearly presented as part of a developed legal argument. In one subsection of their brief they emphasize that the sellers and Shadowland did not take steps to "complete the exercise of the Repurchase Options prior to the [initial] May 18, 2017 Judgment" of Judge Roemer. However, they fail to develop an argument from this based on the law of the case doctrine, beyond the one that they raise in a separate subsection of their brief, which we address in the following paragraph. They also fail to develop an argument we can understand when they point to rulings in **Global I** that are favorable to them, such as our determination that Global failed to persuade us that various contract terms establish that the repurchase options are subordinate to Global's mortgages. The sellers assert that their repurchase rights "remain viable." But, as best we understand their point, it is irrelevant. The sellers are correct if they mean to argue that we did not hold in **Global I** that the sellers could never, under any circumstances, exercise their rights under the Repurchase Agreements as written.[5] However, we did decide, based on the record and the arguments of the parties (or the lack thereof), that Shadowland had not caused the options to ripen, precluding their execution based on the record that was before us. Thus, if the sellers were ever going to bring the quitclaim deeds to our attention and contend that they were the products of valid ripening of the repurchase rights, the

---

[5] Global acknowledges in this appeal that the sellers have not lost their options under the Repurchase Agreements. Global asserts that, in the event of a sheriff's sale at which Global is the winning bidder, Global would "succeed to the rights and obligations of Shadowland under the Repurchase Agreements." We note this only to establish Global's concession regarding the options and not to express any opinion about what could or should occur at or following a sheriff's sale.

time to have done that was when Global raised the execution-of-the-options issue in *Global I*.

¶22    The sellers do not dispute, because they cannot, that the execution-of-the-options issue was explicitly raised by Global and resolved by this court in *Global I*. However, they contend that it was not an issue that they could address in *Global I*, because this court was limited to considering only events that occurred before Judge Roemer's May 18, 2017 judgment that was appealed in *Global I*. We agree with both of two related arguments that Global makes in response, the second of which the sellers fail to contest.

¶23    First, as our summary above reveals, the sellers' argument relies on documents that were in fact properly available to this court, either because they were in the appellate record or because they were public records, of which this court may take judicial notice. *See State v. Vesper*, 2018 WI App 31, ¶17 n.4, 382 Wis. 2d 207, 912 N.W.2d 418 ("We may take judicial notice of public records"; citing authority that includes WIS. STAT. § 902.01(2)(b), (3) (2015-16)). Thus, as Global now argues, the sellers could have directed this court, in their *Global I* briefing, "to the very documents they now say are dispositive." This defeats the sellers' argument based on the general rule that appellate review is limited to the appellate record, which may not be supplemented with items created after the final decision under review. A contrary ruling would be unfair to Global, which was entitled to consider resolved an issue that it squarely raised and that this court squarely addressed at least as of the time of briefing in *Global I*, absent potential reconsideration by this court or review by our supreme court.

¶24    Global's second, related argument is that, if the sellers had alerted this court in *Global I* to their quitclaim transactions with Shadowland and their current

11

argument about streamlined procedures, that argument, if correct, would have resolved the issue of whether the repurchase options had ripened and would also have *rendered the reformation issue moot*. That is, it would not have mattered whether the Repurchase Agreements were properly reformed by Judge Roemer if the sellers could have established that, as of the time of briefing in *Global I*, there were quitclaim deeds that were the products of valid ripening of the Repurchase Agreements as written. Appellate courts routinely consider evidence of events that occur after the final order or judgment under review in order to resolve potential mootness issues. *See, e.g.*, *State ex rel. Olson v. Litscher*, 2000 WI App 61, ¶¶2-3, 233 Wis. 2d 685, 608 N.W.2d 425. The sellers fail to directly address this mootness-based argument, conceding the point.

¶25 While they do not fully develop the argument, the sellers apparently mean to ask us to conclude that the law of the case doctrine cannot apply in any case in which, as here, the argument to be foreclosed would have required reliance on any document created after the date of the initial court decision. More generally, the sellers attempt to distinguish on narrow grounds case law cited by Global, including *Univest Corp.* and *Stuart* (cited above, ¶¶5-6). However, when we look to the substance of the case law that we summarize above we see no reasonable basis to distinguish the circumstances here. The execution-of-the-options issue was resolved in a "'decision … by an appellate court'" and there is no argument that "'the evidence on a subsequent trial was substantially different, [or] controlling authority has since made a contrary decision of the law applicable to such issues.'" *See Brady*, 130 Wis. 2d at 448 (quoting *White*, 377 F.2d at 431-32).

¶26 It is true that the sellers set in motion the exercise of the options and quitclaim transactions one week after Judge Roemer entered the rulings appealed in *Global I*, which were never stayed. However, the sellers do not dispute that, no

later than June 29, 2017, which was more than two months before Global filed its opening appellate brief in *Global I*, counsel for Shadowland announced that these transactions were imminent. And, by July 17, 2017, the executed quitclaim deeds had been recorded, well before the sellers filed their appellate brief.

¶27 We note that, in the course of briefing in *Global I*, the sellers did not respond to Global's argument that the options could not have been executed by explaining to this court that the sellers were not able to respond based on an inadequate record. Nor did the sellers move this court for reconsideration of *Global I* on the ground that we had reached out to decide an issue that we lacked a proper basis to decide. Instead, they left this court to resolve the issue based on their silence and then remained silent on the topic after our decision.

¶28 In sum, we conclude that ¶53 of *Global I* is law of this case, at least as to events that could have been established based on the record at the time of briefing in *Global I*. We emphasize that, for reasons that should be clear from our discussion to this point, our ruling is necessarily limited to foreclosing arguments about the ability of the sellers to execute the repurchase options based on the contents of the appellate record as it existed at the time of *Global I*, and all documents available to us as public records, such as the quitclaim deeds that were recorded in July 2017.

¶29 Based on this conclusion, we reverse Judge Hepler's order denying Global's motion to "rescind" the quitclaim deeds to the sellers and direct the circuit court to enter a judgment voiding the deeds. *See **Hill***, 9 Wis. at 19 (an issue "must be considered as determined by the former adjudication, and that the order of the circuit court [to the contrary] should be reversed, and the former order … restored.").

13

¶30    We question whether the equitable doctrine of rescission is the proper label for the relief sought by Global. *See Tuchalski v. Moczynski*, 152 Wis. 2d 517, 518 n.1, 449 N.W.2d 292 (Ct. App. 1989) (rescission is an equitable remedy). We think that the sellers make a good point, as far as it goes, when they suggest that Global has not shown that it is entitled to an equitable remedy of rescinding contracts to which Global was not a party. *See First Nat'l Bank and Trust Co. of Racine v. Notte*, 97 Wis. 2d 207, 225-26, 293 N.W.2d 530 (1980) (rescission requires "each party … to return to the other such benefits as have been received from the other"). However, the law of the case doctrine requires a remedy in this unusual situation. As Global points out, the quitclaim deeds were the product of the erroneous reformation order of Judge Roemer, and it is only for purposes of this appeal that the sellers have come up with the plainly after-the-fact justification of a "streamlined" repurchase process.[6] Under these circumstances, following the reasoning of such cases as *Hill*, the law of the case doctrine requires us to direct the circuit court to void the quitclaim deeds because this effectively restores the ruling in *Global I*, by reversing the erroneous circuit court ruling of which the deeds are the direct results.

¶31    We could end this opinion here, because our decision on this issue requires reversal and rejects all pertinent arguments made by the sellers. However, we chose to resolve a second issue that Global argues as an alternative basis for reversal. We do so because the issue is fully briefed, presents a question of law

---

[6] We express no opinion about whether the sellers and Shadowland could, in general, reach a valid agreement that diverges from the terms of the Repurchase Agreements and that effectuates transfer of the properties. Instead, based on the specific law of the case argument now made by Global, we hold that the quitclaim deeds must be voided because they are not the products of valid ripening of the repurchase options under the Repurchase Agreements as written, based on the ripening issue resolved in *Global I*.

requiring no further factual development, and our resolution might assist the parties and the circuit court following remand of this appeal, depending on future events.

*Waste Upon The Property*

¶32    Global argues that Shadowland was, after the May 18, 2017 initial decision of Judge Roemer, and still remains, barred from providing the required notice to the sellers, causing the ripening of the repurchase options, because this would constitute "waste upon the Mortgaged Property" that is prohibited by the May 18, 2017 judgment.  We reject this "waste" argument.

¶33    The interpretation of a judgment is a question of law that we decide de novo.  ***Jacobson v. Jacobson***, 177 Wis. 2d 539, 546–47, 502 N.W.2d 869 (Ct. App. 1993).  We interpret judgments in the same manner in which we interpret other written instruments, as a whole and in context.  ***Estate of Schultz v. Schultz***, 194 Wis. 2d 799, 805, 535 N.W.2d 116 (Ct. App. 1995).

¶34    In the order for judgment of foreclosure, Judge Roemer included the following prohibition:  "All parties and all persons claiming under them are enjoined from committing waste upon the Mortgaged Property."  *See* WIS. STAT. § 846.12 (2017-18)[7] (a judgment of foreclosure "may enjoin the defendants and all persons claiming under them from committing waste or doing any act that may impair the value of the mortgaged premises").

¶35    Global interprets this language of Judge Roemer's judgment as "prohibit[ing] Shadowland from, among other things, taking actions that would impair [Global's] security interest in the Mortgaged Property," including taking

---

[7] For the remainder of the opinion, all references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

15

steps to transfer of the property to the sellers, either under the terms of the Repurchase Agreements or under an alternative or modified mechanism.

¶36    In support, Global cites case law for the proposition that "waste" in the context of a security interest of a mortgagee includes acts that result in "an impairment of the security by subjecting it to liens superior to that of the mortgagee," *see Dick & Reuteman Co. v. Jem Realty Co.*, 225 Wis. 428, 435, 274 N.W. 416 (1937), or that otherwise "depreciate[] the value of the security," *see First Nat'l Bank of Neenah v. Clark & Lund Boat Co.*, 68 Wis. 2d 738, 741, 229 N.W.2d 221 (1975).

¶37    The problem with Global's argument is that here, the "impairment of the security," to use the phrase from *Dick & Reuteman Co.*, was an impairment that preexisted the loans at issue, and the circumstance here were not contemplated in the case law that Global cites.  Further, as we had occasion to note in *Global I*, Global

> had notice of the Repurchase Agreements when it loaned the $8 million to Shadowland Holdings.  This means that Global had the ability to see both that the properties were encumbered by … repurchase options and that the … Stickney, and Strohmeyer Groups' Repurchase Agreements lacked express subordination clauses ….

*Global I*, No. 2017AP1137, ¶50.  That is, when Global made the loans, it was aware of the potential risk of sales to the sellers in a manner that could or would imperil the security interest of Global.

¶38    Judge Roemer was aware of the nature and timing of the Repurchase Agreements and the loans.  If the court had wanted to accomplish the result that Global now seeks, the court had many ways to express the concept that Shadowland would be barred from taking steps to transfer the property to the sellers.  But under

16

these circumstances, entering a conventional "waste" prohibition of the type contemplated in WIS. STAT. § 846.12, without further explanation or direction, was not a recognizable way of accomplishing that result. Put differently, under these circumstances, if Global was to obtain the significant protection of the prohibition that it seeks, it was obligated to advocate successfully for a clearly stated injunction.

¶39 We emphasize that we resolve here only the specific "waste" argument advanced by Global. We intend to express no additional views, not already expressed in *Global I* or in this opinion, about other potential legal theories, under the facts as they may be established in future proceedings, which could preclude transfer of the property from Shadowland to the sellers.

## CONCLUSION

¶40 For these reasons, we reverse Judge Hepler's ruling that the sellers are not barred by the law of the case doctrine from arguing, based on the contents of the appellate record as it existed at the time of *Global I*, that the options to repurchase had ripened under the Repurchase Agreements. Accordingly, we direct the circuit court to enter a judgment voiding the quitclaim deeds because they were transferred and recorded based on erroneous reformation by Judge Roemer. We affirm Judge Hepler's ruling on the "waste" issue and hold that an otherwise lawful transfer of the property from Shadowland to the sellers would not constitute "waste upon the Mortgaged Property" that is prohibited by Judge Roemer's May 18, 2017 judgment. We remand for further proceedings consistent with *Global I* and with this opinion.

*By the Court.*—Judgment affirmed in part and reversed in part.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.

17